Gloria HOLMES, et al.,
Plaintiffs-Appellants,

v.

CONTINENTAL CAN COMPANY, et al.,
Defendants-Appellees.

No. 80–9026.

United States Court of Appeals,
Eleventh Circuit.

June 9, 1983.

William F. Gardner, Birmingham, Ala., for Continental Can Co.

Jerome A. Cooper, Birmingham, Ala., for United Steelworkers, AFL–CIO, et al.

O. Williams Adams, III, Birmingham, Ala., for all class members who did not object to consent decree.

Before HILL and VANCE, Circuit Judges, and TUTTLE, Senior Circuit Judge.

VANCE, Circuit Judge:

This is an appeal, pursuant to 28 U.S.C. § 1291, from a final order of the district court approving settlement of an antidiscrimination class action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Appellants object to the intraclass distribution of a $43,775 lump sum back pay award, under which the eight named plaintiffs would receive half of the total fund. We hold that proponents of the settlement did not meet their burden of proving that the disparate allocation of the award was fair, adequate and reasonable. We further find that because the merits of many monetary damages and back pay claims in this case are uniquely individual to particular class members, the right to opt out of the class, normally accorded only in classes certified under Federal Rule of Civil Procedure 23(b)(3), must be extended to members of this (b)(2) monetary relief class. The objectors do not contest the propriety of the total amount of the lump sum award and we do not consider its overall fairness, although fallout from our disposition of the case may result in disintegration of the settlement that gave rise to that award.

We review the facts of this case in the light most favorable to the lower court's approval of the settlement. *Armstrong v. Board of School Directors,* 616 F.2d 305, 315

Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiffs-appellants.

(7th Cir.1980). The lawsuit was originally filed on behalf of eight named plaintiffs and "others similarly situated" against three Birmingham, Alabama plants of the Continental Can Company and against the United Steelworkers of America and its Local Unions 4627 and 7636. The complaint, which was filed in 1974, was an across the board challenge alleging discrimination on the basis of race and sex in employment opportunities in hiring, mutual job assignments, clerical job assignments, supervisory job assignments, testing for promotions, educational requirements, training, layoffs, recalls, transfers, discipline and discharge.

Following the filing of answers by the defendants, extensive discovery ensued. Settlement negotiations began in 1976 and were pursued simultaneously with discovery. The district court held the case in abeyance as settlement discussions progressed.

During the progress of the settlement efforts, two separate actions were filed by employees of the defendant company at the facilities involved in the eventual settlement. On July 11, 1978, Frederick Seay filed an individual and class action contesting his denial of supervisory opportunities and the denial of promotional opportunities to the class of black employees at the Birmingham plants. On October 19, 1978, Robert Lawrence filed a similar individual action. As the original case, filed by Holmes, et al., neared settlement, Continental Can filed motions in the *Seay* and *Lawrence* cases requesting transfer to the district judge assigned the *Holmes* case. Over the objections of Seay and Lawrence, the cases were transferred and consolidated with *Holmes.*

By October 1978, a proposed settlement had been reached by the class representatives and the defendants. On November 1, the parties presented to the district court a proposed consent decree which would be binding on the putative class described in the original complaint. There had been no class certified at the time the settlement was submitted.

The proposed settlement provided for injunctive and declaratory relief [1] as well as the payment of a $43,775 lump sum back pay award to the class. There was no requirement or understanding between the plaintiff employees and defendant company as to how the back pay fund would be divided among the class members. The intraclass distribution of the fund was left to the class and its representatives. Under the method of distribution eventually adopted by the class representatives, the eight named plaintiffs would receive approximately one-half of the fund. The remainder of the fund would be allocated, according to a schedule of distribution, to the remaining 118 members of the class. [2]

The district court preliminarily approved the consent decree on November 6, 1978 and scheduled a hearing on objections for December 15, 1978. Thirty-nine class members objected to the suggested allocation of the settlement. During the three days of hearings on the objections to the fairness of the distribution, all sides presented witnesses. Almost two years later, in September 1980, the court certified the case as a class action, approved the consent decree, and

---

1. The non-monetary provisions of the settlement included the establishment of goals for minority and female representation in trade and craft jobs and of procedures for promotion to supervisory positions. Because the plants at which the bulk of the class and all of the named plaintiffs and objecting class members worked have been permanently closed, there is no challenge to the non-monetary provisions of the consent decree. The challenge is limited to the division of the monetary fund.

2. The settlement proposed to award back pay according to the following schedules:

(a) Payments in designated amounts, totalling $21,000, to the eight named plaintiffs.

(b) Payments in designated amounts, totalling $16,925, to 32 class members (Subclass I), consisting of all females who were employed at Plant 187 as of June 16, 1973.

(c) Payments in designated amounts, totalling $5,850, to nine class members (Subclass II), consisting of all black persons who were employed at Plant 410 as of June 16, 1973.

overruled the objections to the settlement allocation. The court made findings that the higher monetary allocations to the named plaintiffs were justified by their meritorious individual claims, claims that were not common to the class. Class members objecting to the settlement appealed.

(1)

Distribution of the Settlement Fund

■ In reviewing the validity of a class action settlement, a district court's decision will be overturned only upon a clear showing of abuse of discretion. *In re Chicken Antitrust Litigation,* 669 F.2d 228, 238 (5th Cir.1982) (Unit B);[3] *United States v. City of Alexandria,* 614 F.2d 1358, 1361 (5th Cir. 1980); *United States v. City of Miami,* 614 F.2d 1322, 1329–31, 1334–35 (5th Cir.1980), *modified on other grounds,* 664 F.2d 435 (5th Cir.1981) (en banc); *Miller v. Republic National Life Insurance Co.,* 559 F.2d 426, 429 (5th Cir.1977). Although settlement is the preferred method of resolving Title VII suits, the class action settlement process is "more susceptible than adversarial adjudications to certain types of abuse." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.1978) (*Pettway IV*), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Federal Rule of Civil Procedure 23(e) mandates judicial approval of all class action settlements, and that requirement is manifested in both substantive and procedural protections accorded to absent class members. "In addition to requiring that the trial court evaluate whether a class action settlement is 'fair, adequate and reasonable and not the product of collusion between the parties,' the law accords special protections, primarily procedural in nature, to individual class members whose interests may be compromised in the settlement process." *Pettway IV,* 576 F.2d at 1169, *quoting Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). While most cases deal with the fairness of the total settle-

ment as between the defendant and the class as a whole, the former fifth circuit recently held that the same legal principles apply "with as much force" to appellate review of the allocation agreement as to review of the settlement between plaintiffs and defendants. *In re Chicken Antitrust Litigation,* 669 F.2d at 238. *See also In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 218–21 (5th Cir.1981) (*Container I*), *cert. denied,* 456 U.S. 998, 1012, 102 S.Ct. 2283, 2308, 73 L.Ed.2d 1294, 1309 (1982).

■ Appellate courts "must have a basis for judging the exercise of the district judge's discretion." *Cotton v. Hinton,* 559 F.2d at 1330. Proponents of class action settlements bear the burden of developing a record demonstrating that the settlement distribution is fair, reasonable and adequate. *See* Federal Judicial Center, Manual for Complex Litigation § 1.46, p. 56 (West ed. 1981). *See also Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357, 1367 (N.D.Ga.1979), *modified on other grounds,* 645 F.2d 488 (5th Cir.1981); *Foster v. Boise Cascade, Inc.,* 420 F.Supp. 674, 680 (S.D.Tex.), *aff'd,* 577 F.2d 335 (5th Cir. 1976); 7A C. Wright & A. Miller, Federal Practice & Procedure § 1797, pp. 229–30 (1972).

■ When a settlement explicitly provides for preferential treatment for the named plaintiffs in a class action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness. In *United States v. City of Miami,* 614 F.2d at 1331 we noted that careful scrutiny by the court is "necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members." Similarly, in *Pettway IV,* 576 F.2d

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) this circuit adopted as precedent all former fifth circuit cases submitted or decided prior to October 1, 1981. In *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34

(11th Cir.1982), the court held that Unit B panel or en banc court decisions of the former fifth circuit also are binding precedent in the eleventh circuit.

at 1217 the court stated that in a dispute over the allocation of a settlement fund, "the court should not allow a majority, no matter how large, to impose its decision on the minority. In such circumstances, objection by a few dissatisfied class members should trigger close judicial scrutiny to ensure that the burden of settlement is not shifted arbitrarily to a small group of class members." We agree that "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank,* 91 F.R.D. 434, 441–42 (S.D.N.Y.1981), *aff'd,* 668 F.2d 654 (2d Cir.1982).

█ Although there is no rule that settlements benefit all class members equally, *Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 506 n. 5 (5th Cir.1981), a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class. Courts have refused to approve settlements on the ground that a disparity in benefits evidenced either substantive unfairness or inadequate representation. *See, e.g., Franks v. Kroger Co.,* 649 F.2d 1216, 1226 (6th Cir.1981) (reversing district court's approval of settlement when "the 'preferred position' of the named plaintiffs should have signaled the district court of potential inequities in this proposed settlement"); *Plummer v. Chemical Bank,* 91 F.R.D. at 442 ("such disparities must be regarded as *prima facie* evidence that the settlement is unfair to the class, and a heavy burden falls on those who seek approval of such a settlement") (citations omitted). *See also* Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1553 n. 91 (1976). The inference of unfairness may be rebutted by a factual showing that the higher allocations to certain parties are rationally based on legitimate considerations. Settlements entailing disproportionately greater benefits to named parties are proper only when the totality of circumstances combine to dispel the "cloud of collusion which such a settle-

ment suggests." *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.,* 76 F.R.D. 173, 182 (S.D.N.Y.1977). *See, e.g., Fowler v. Birmingham News Co.,* 608 F.2d 1055 (5th Cir.1979); *Thornton v. East Texas Motor Freight,* 497 F.2d 416 (6th Cir.1974); *Boyd v. Bechtel Corp.,* 485 F.Supp. 610 (N.D.Cal.1979); *Leisner v. New York Telephone Co.,* 398 F.Supp. 1140 (S.D.N.Y.1974); *Bryan v. Pittsburgh Plate Glass Co.,* 59 F.R.D. 616 (W.D.Pa. 1973), *aff'd,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974).

In this case the objecting class members' central argument is that they received inadequate representation in the settlement and settlement approval process. One component of this argument, and in certain respects an independent contention, is that the inadequacy of representation is evidenced by the disparate distribution of the fund and by class representatives' failure to consider the merits of the objecting parties' individual claims. The proponents of the settlement respond that the district court was entitled to find, on the basis of the evidence presented at the fairness hearing, that the disparities in money payments were justified by the value of the unique, individual claims of the named plaintiffs.

█ Based on the present record, we conclude that the settlement proponents have not overcome the facial unfairness of the allocation of half the back pay award to the eight named plaintiffs. The evidentiary record consists of interrogatory answers given by the named plaintiffs and of evidence presented at the settlement fairness hearing. Because the settlement proponents acknowledge that "the interrogatories tracked the class allegations of the complaint, with no interrogatory addressed to individual claims," we limit our inquiry to the record of the fairness hearing.

Proponents and opponents of the settlement presented evidence at the fairness hearing. In an attempt to establish their claims, several objecting plaintiffs testified that they were potentially the victims of

unlawful discrimination. By contrast, none of the named plaintiffs testified or offered evidence as to the merits of their individual claims.[4] Rather, the evidence of the individual claims presented by the proponents consisted solely of the testimony of counsel for the class. In counsel's opinion, the proposed division of the back pay fund was fair because the named plaintiffs had meritorious individual claims. The settlement proponents conceded at oral argument before this court that "there is no doubt about the fact that the allocation of the higher amounts to the eight named plaintiffs was based on the judgment of the plaintiffs' attorney that they had individual claims worth more than the amounts allocated to them."

Courts often accord great weight to the opinions of counsel for the class in approving class action settlements. *See Pettway IV,* 576 F.2d at 1215 ("trial court is entitled to take account of the judgment of experienced counsel for the parties"); *Cotton v. Hinton,* 559 F.2d at 1330 ("the trial court is entitled to rely upon the judgment of experienced counsel for the parties"). The degree of deference given counsel's opinion depends, however, upon the posture of the case and upon the amount of dissent within the "client" class:

> We recognize that discretion on the part of the class attorney often is an unavoidable fact of class action life.... [T]he traditional notion of the "client" deciding important litigation questions is often problematic in the class action context because of the difficulty in identifying the client. The class itself often speaks in several voices. Where there is disagreement among the class members concerning an appropriate course of action, it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole. *If the attorney's decision in the face of such disagreement affects each class member more or less equally, and no allegation is made that*

> *the rights of a definable minority group within the class were sacrificed for the benefit of the majority,* the attorney's views must be accorded great weight, and the trial judge's decision to ratify the attorney's action will seldom be overturned.

> At least in the context of a proposed back pay settlement, however, at some point objections from the class may become so numerous that in a very real sense it can be said that "the class" has not agreed to the proposal, that counsel's perceptions of the best interests of the class are faulty, and that approval of the settlement by the district court constitutes an abuse of discretion. No simple percentages are determinative, of course, and each case must turn on its own facts. While recognizing the difficult task facing the district court in the absence of crisp guidelines and well-articulated standards for review of a settlement in the face of significant dissent from the class, we are firmly convinced that under the peculiar circumstances of this case, approval of the settlement in the face of such widespread dissent evidenced below constituted an abuse of discretion. The district court should not have placed its imprimatur upon this agreement.

*Pettway IV,* 576 F.2d at 1216 (emphasis added) (internal cross references omitted). *See also Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir.1982) ("findings and conclusions should not be based simply on the arguments and recommendations of counsel"); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) ("[w]hile the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement"); *Boyd v. Bechtel Corp.,* 485 F.Supp. at 622 ("recognizing the potential conflict between attorneys and the class they represent, the Court should not blindly follow counsel's recom-

---

4. Two class representatives did appear at the fairness hearing, but they did not testify as to their or anyone else's individual claims.

mendations but give them appropriate weight in light of all factors surrounding the settlement"); 7A C. Wright & A. Miller, Federal Practice & Procedure § 1797, p. 183 (1972).

Without intending any disparagement of the eminent class counsel in this case, we conclude that the attorney's opinion is an insufficient basis upon which to approve the disproportionate and facially unfair allocation of this back pay award. A number of specific and general concerns cause us to reject the procedure adopted by the district court. Reliance on counsel's opinion tends to render the district court captive to the attorney and fosters rubber stamping by the court rather than the careful scrutiny which is essential in judicial approval of class action settlements. Such a practice offers the same host of dangers that underlies the evidentiary rule against the admissibility of hearsay testimony. The objectors and the court must judge the evidence second hand and determine the credibility, not of the actual witnesses, but of the attorney for such witnesses. Further, the class attorney may not be aware of individual claims of absent class members. In the present case, class counsel testified at the fairness hearing that his primary contact with the class was through its named representatives and that he knew little about the merits of absent class members' individual claims.[5] Finally, the conversion of attorneys' opinions into evidence will usually be met in kind with one attorney's opinion

---

5. For example, counsel for the class testified as follows at the fairness hearing:

Q Now, did Mr. Seay's name ever come up as part of the settlement negotiations in this case?
A I don't recall specifically the name came up. I do know that I was under the impression during most of the time that the settlement negotiations were underway that Mr. Seay was a temporary supervisor.
Q You were not aware he was removed as a temporary supervisor sometime in late '75 or '76?
A No I wasn't.
Q Would it be correct to say that Mr. Seay was never considered, that his personal claim was unique to the other named plaintiffs of the class?
A Mr. Seay's removal from a supervisory position, no, it was not.

⋯ ⋯ ⋯ ⋯ ⋯

Q At the time the consent decree was finalized, you were not aware whether Mr. Seay had a meritorious or a non-meritorious claim concerning a supervisory promotion?
A No, I was aware of the supervisory situation but as to his personal individual claim, no, I didn't know it.
Q And at the time of the decree being finalized, you did not know whether Mr. Otis Wedgeworth had a meritorious claim or a non-meritorious claim, did you?
A That is correct.
Q And that would hold true as to the other objectors that I represent, is that not true?
A No—I can't think of individuals.
Q Well, would that hold true with respect to Mr. Powers?
    At the time the decree was found to be finalized you were not aware whether his claim was meritorious or non-meritorious?
A I don't recall Mr. Powers' name being mentioned.

⋯ ⋯ ⋯ ⋯ ⋯

Q After making those few questions in the deposition did you pursue Ms. Ray's claim in any way beyond those questions in the deposition?
A I am sure that I talked with various named plaintiffs about it. I may even—I am really fuzzy in this point, but I believe that I talked with Ms. Ray about it.
Q In regard to Mr. Clarence Osborne, was he ever considered as part of the settlement in this case?
A I don't recall any specific discussion of Mr. Clarence Osborne.
Q Were you aware that before the objections to the consent decree were filed in this case, by Mr. Osborne, that he had a claim or alleged to have a claim against the company based on racial discrimination?
A No, I was not.
Q Then would it be correct to say there was no discovery or investigation of his claim prior to the settlement?
A That would be correct because as I understand Mr. Osborne's claim, it arose out of an incident in 1977 but I am not sure when.

⋯ ⋯ ⋯ ⋯ ⋯

Q Mr. Osborne was not one of these people you had informal contact with?
A He was not.
Q Mr. Herbert Sims, did you have any informal contact with him?
A No.
Q Was he ever considered in the settlement of this case?
A As I recall there was no mention of Mr. Sims and his desire to go to the Buffalo Rock plant during the negotiations.
Q What about Mr. Frank Nolan, did you ever have any contact with him prior to the settlement of this case?
A No, I did not.

being countered by another's. This results in a reduction in the overall quality and quantity of evidence available to the district court.

Thus, at least in connection with the disparate allocation of a finite settlement fund among many class members, the following guideline articulated in the Manual for Complex Litigation § 1.46 is pertinent:

> In certain cases in which many of the facts relevant to settlement are undisputed, it may be desirable to permit those facts to be established by the uncontradicted representations of counsel in briefs or otherwise. Normally, however, in view of the complexity which obviously attends settlement issues, it is wise in most cases to rely upon proven facts, particularly economic facts.

■ As in *Pettway IV,* the "fundamental problem facing us in our task today is the absence of an adequately developed factual record." 576 F.2d at 1183. Because the district court approved the settlement distribution on the basis of a deficient record, we reverse and remand for further proceedings.[6]

### (2)

#### Opting Out of Title VII Class Actions Brought Under Rule 23(b)(2)

In the present case, certain class members attempted repeatedly to opt out or, more precisely, to avoid becoming part of the class at all. Employee Frederick Seay filed an Equal Employment Opportunity Commission charge in 1975, a year before settlement negotiations *began* in the *Holmes* case. In 1978, Seay filed a lawsuit in federal court, challenging his denial of a permanent promotion to a supervisory position with Continental Can. Seay filed interrogatories, which the court disallowed. The *Seay* case was consolidated with the *Holmes* case, over Seay's objection, after preliminary approval of the consent decree in *Holmes.* Seay received no individual relief under the consent decree. Robert Lawrence also filed a separate EEOC charge based on denial of promotional opportunities and subsequently filed a separate lawsuit under Title VII. As with the *Seay* case, the *Lawrence* case was consolidated with *Holmes* despite Lawrence's objection. The consent decree provided Lawrence no relief for his supervisory claim and operated as a bar to the litigation of his independent action. Similarly, certain Continental Can employees, whose separate EEOC charges were pending at the time of settlement, had their cases absorbed into the *Holmes* class action.

Objectors to this settlement moved in the district court that opt out procedures be established for class members dissatisfied

Q Did you have any knowledge of the claims he made in this case before the time he made them and his objections to the decree?

A Yes, I had knowledge of the claims.

Q What knowledge did you have?

A There was a general—at practically every meeting it would be reported to me that blacks felt that once they would bid on a job and they would be the senior bidder, that the posted jobs would be removed and the vacancies would not be filled and that the supervisor would then go out into the plant and encourage senior white employees to bid and the company would then repost the vacancy and this time a senior white would bid and the black would not get the job.

That was a recurring complant [sic].

Q And in regard to Mr. Nolan's individual claim, was there ever any specific investigation made as to his claim prior to the time of this settlement?

A There was not a specific investigation made of Mr. Nolan's individual claim that a particular bid was removed and not filled.

Q Prior to the settlement, you have knowledge that Mr. Nolan was one of the people who was affected by that claim of taking bids down?

A As I stated, Mr. Wiggins, I can't say whether I did or not.

At various times this was mentioned and his name may have been one of those.

6. The objectors contend that the individual claims of a number of named plaintiffs were barred by the applicable statute of limitations. The present record is insufficient to support any conclusion on the issue. We note, however, that individual claims outside the jurisdictional limitations period, *see United Airlines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), cannot form the basis of a disproportionate allocation of a back pay award.

with the monetary aspects of the proposed settlement. The district court denied the motion, concluding that the fairness hearing provided the objectors "a means of litigating all of their individual claims, including claims for higher back pay, or for back pay, or any other individual relief." Because many monetary claims in this case are unique to individual class members, we hold that the right to opt out of the class, normally accorded only to members of classes certified under Rule 23(b)(3), must be extended to all members of this (b)(2) class.

Civil rights class actions, including those brought pursuant to Title VII, are generally treated under subsection (b)(2) of Rule 23. *See Kincade v. General Tire & Rubber Co.,* 635 F.2d 501 (5th Cir.1981); *Robinson v. Union Carbide Corp.,* 544 F.2d 1258 (5th Cir.1977), *cert. denied,* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1978); Rutherglen, Notice, Scope and Preclusion in Title VII Class Actions, 69 Va.L.Rev. 11, 23 (1983); Note, Notice in Rule 23(b)(2) Class Actions for Monetary Relief: *Johnson v. General Motors Corp.,* 128 U.Pa.L.Rev. 1236, 1237 n. 3 (1980). We acknowledge that this case was properly certified as a (b)(2) class action. Subsection (b)(2) contemplates class cases seeking equitable injunctive or declaratory relief, and back pay comes within the ambit of (b)(2) because the "demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy, to be determined through the exercise of the court's discretion." *Johnson v. Georgia Highway Express,* 417 F.2d 1122, 1125 (5th Cir.1969). *See also Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 256–57 (5th Cir.1974) (*Pettway III*), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). This case does not require us to reexamine the *Johnson-Pettway* characterization of back pay as equitable relief and thus cognizable under subsection (b)(2). The *Johnson-Pettway* line of cases reflect our conviction that Title VII and the class action rule should be construed so as to further the strong public policy of eradicating all vestiges of racial discrimination in employment. This court and the cases binding on this court have consistently recognized that discrimination in employment is "one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses." *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 (11th Cir.1982), *quoting Culpepper v. Reynolds Metals Co.,* 421 F.2d 888, 891 (5th Cir.1970).

■ Vigorous enforcement of Title VII need not occur, however, at the expense of the rights of absent members of classes certified under subsection (b)(2). *See Pettway IV,* 576 F.2d at 1214. The Supreme Court reminded us in *General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) and *East Texas Motor Freight Systems, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), that even in Title VII cases "careful attention to the requirements of Federal Rule Civ.Proc. 23 remains nonetheless indispensible," *Rodriguez,* 431 U.S. at 405, 97 S.Ct. at 1898 and that "a Title VII action, like any other class action, may only be certified if the trial court is satisfied, after a vigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon,* 457 U.S. at 161, 102 S.Ct. at 2373. *See also Freeman v. Motor Convoy, Inc.,* 700 F.2d 1339, 1346–48 (11th Cir.1983). Thus, Title VII class actions must satisfy the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy of representation. *Falcon* and *Rodriguez* reaffirm that general policies of antidiscrimination do not justify dispensing with the procedural protections granted by Rule 23 to absent class members who are, after all, also members of groups that Title VII seeks to protect. As Chief Judge Godbold warned in *Johnson v. Georgia Highway Express:*

> The broad brush approach of some of the Title VII cases is in sharp contrast to the diligence with which in other areas we carefully protect those whose rights may be affected by litigation. If this

were an individual cross-action against an employee at one of appellee's remote terminals we would turn intellectual handsprings over questions of notice and process to him and opportunity to protect his interests—such issues as whether the marshal dropped the notice at the door or handed it to the child at the frontgate. But when the problem is multiplied many-fold, counsel, and at times the courts, are moving blithely ahead tacitly assuming all will be well for surely the plaintiff will win and manna will fall on all members of the class. It is not quite that easy.

417 F.2d at 1127 (Godbold, J., specially concurring).[7]

The United States Supreme Court has not yet decided whether opting out of (b)(2) classes is ever permissible, and the circuit courts of appeals are split on the issue. *Compare Plummer v. Chemical Bank,* 668 F.2d at 657; *Dosier v. Miami Valley Broadcasting Corp.,* 656 F.2d 1295, 1299 (9th Cir.1981); *Laskey v. International Union, United Automotive, Aerospace & Agricultural Implement Workers,* 638 F.2d 954, 956 (6th Cir.1981); *Penson v. Terminal Transport Co.,* 634 F.2d 989, 993 (5th Cir. 1981); *Bauman v. United States District Court,* 557 F.2d 650, 659–60 (9th Cir.1977). Cases examining the right to opt out of Title VII class actions brought under subsection (b)(2) reflect a tension between the policy of facilitating antidiscrimination class actions and the need to protect the rights of absent class members. The general rule in this circuit remains that absent members of (b)(2) classes have no automatic right to opt out of the lawsuit and to prosecute an entirely separate action. *See Penson,* 634 F.2d at 993; *Grigsby v. North Mississippi Medical Center, Inc.,* 586 F.2d 457, 461 (5th Cir.1978); *LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 288 n. 7 (5th Cir.1975); *United States v. United States Steel Corp.,* 520 F.2d 1043, 1057 (5th Cir. 1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1977). The rationale for this general rule was articulated by the court in *Kincade v. General Tire & Rubber Co.,* 635 F.2d at 507. The *Kincade* court found that "the right to opt out, which is denied when a Rule 23(b)(2) class is tried, also need not be provided when such a case is settled." The court based this conclusion on three grounds. First, under the certification procedure of Rule 23, the named parties must have been adjudged adequate representatives of the class. Secondly, the *Kincade* court reasoned that Rule 23(e) provided sufficient additional protections for class members when a class suit is settled. *Id.* at 507. Thirdly, the court found that the important public interest in favor of settlement dictates that objectors to the settlement of a Rule 23(b)(2) class action need not be provided an opportunity to opt out of the settlement: "allowing objectors to opt out would discourage settlements because class action defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger claims opting out to pursue their individual claims separately." *Kincade,* 635 F.2d at 507, *quoting Cotton v. Hinton,* 559 F.2d at 1331.

---

7. As one commentator argued:

[I]n *Wetzel* [*v. Liberty Mut. Ins. Co.,* 508 F.2d 239 (3d Cir.1975)], the court in part justified its refusal to require notice for absent members by pointing to the need to effectuate the policies of Title VII: "Suits brought by private employees are the cutting edge of the Title VII sword which Congress has fashioned to fight a major enemy to continuing progress, strength, and solidarity in our nation, discrimination in employment .... The imposition of notice and the ensuing costs often discourage such suits."

This passage epitomizes the dilemma spawned by the growth of Title VII back pay class actions. Courts are mindful of the fact that traditional (b)(2) certification policies deprive absent members of due process consideration, but justify it in the name of the "overriding" public policy objectives of Title VII and continue to classify heterogenous [sic] classes under (b)(2) rather than (b)(3).

The irony here, of course, is that while granting the class great deference on the substantive and policy issues in a suit, courts deny many members of the class procedural fairness.

Rosen, Title VII Classes and Due Process: To (b)(2) or Not To (b)(3), 26 Wayne L.Rev. 919, 952 (1980) (footnote omitted).

This is not to suggest, however, that opt out procedures have no applicability to the (b)(2) class action. Parties to a proposed class action settlement may themselves provide for an opt out procedure by which class members may exclude themselves from the class and litigate their claims in the same action or in a separate lawsuit, *see, e.g., Parker v. Anderson,* 667 F.2d 1204, 1208 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *Penson,* 634 F.2d at 995; *Cotton,* 449 F.2d at 1333; *West Virginia v. Chas. Pfizer Co.,* 440 F.2d 1079, 1082 (2d Cir.), *aff'd by an equally divided Court,* 404 U.S. 548, 92 S.Ct. 731, 30 L.Ed.2d 721 (1971), and in appropriate cases a court may conclude that a proposed settlement should be disapproved unless the parties agree to such a procedure. In *Penson v. Terminal Transport Co.,* the former fifth circuit held that "although a member of a class certified under Rule 23(b)(2) has no absolute right to opt out of the class, a district court may mandate such a right pursuant to its discretionary power under Rule 23." 634 F.2d at 993. This holding followed from *Pettway III,* where the court reasoned that Title VII claimants "dissatisfied with their portion of the [back pay] award should be allowed to opt out in order to prove that they were entitled to a larger portion." 494 F.2d at 263 n. 154. On remand the district judge entered a final order providing "a mechanism for subclass members to opt in or out of the settlement." 576 F.2d at 1166 n. 2. When the case once again came before the former fifth circuit, Judge Goldberg in *Pettway IV* stated that the court had "recently commented that opting out of the lawsuit altogether after a back pay award settlement is not permitted in 23(b)(2) class actions." *Id.* at 1220. Judge Goldberg read footnote 154 in *Pettway III* to require that "dissatisfied claimants be given an opportunity to prove entitlement to a larger individual award *in the same* lawsuit." *Id.* (emphasis in original). Judge Goldberg explained:

> This requirement is consistent with the policies of Rule 23. When individual claims are asserted in the same action, the class attorney, who is familiar with the facts and the progress of the litigation, will be able to present the claimant's case. If relegated to a new suit, the individual might be unable to obtain counsel to prosecute his action when the amount of individual damages is relatively small. The requirement also conserves judicial resources by ensuring that the same judge who is already familiar with the case will rule on the merits of the individual claim. By obviating the need to bring a new lawsuit, the expense of litigating the new individual claim is reduced. This procedure also commends itself because the individual claim generally will be resolved more quickly.

*Id.* at 1220–21 n. 80. The court concluded that "on remand if another settlement of the back pay dispute is reached, the district court should provide those claimants who decide to opt out of the settlement an opportunity to assert their individual claims in this action." *Id.* at 1220.

The *Penson* and *Pettway* decisions represent an acknowledgement that the monetary relief stage of a Title VII case often "begins to resemble a 23(b)(3) action" and that courts have shown increasing "concern with providing the due process rights of the individual class members." *Penson,* 634 F.2d at 994. Similarly in *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 634–35 (9th Cir.1982), a Title VII class action certified under subsection (b)(2), the ninth circuit allowed opting out in part because "[g]iven the breadth and nature of the claims asserted, the class allegations in plaintiffs' complaint, and the procedures adopted by the district court, it appears clear that this case was in essence a Rule 23(b)(3) class action." Monetary awards may give rise to conflicts of interest within the class, especially when certain class members attempt to resolve their individual claims simultaneously with the class claims. This court in *Penson* held that a district court "acting under its Rule 23(d)(2) discretionary power, may require that an opt-out right and notice thereof be given should it believe that such a right is desirable to

protect the interests of the absent class members." 634 F.2d at 994. A district court's decision would only be reversed for abuse of discretion. *Id.* The presence in the lawsuit of a significant number of atypical claims not common to the class activates a requirement that absent class members be given an opportunity to opt out of the class at the monetary relief stage of a Title VII lawsuit or settlement. We hold that the failure of the court below to provide an opt out procedure was, under the facts of this case, an abuse of discretion.

Because the monetary relief stage of this particular Title VII case is functionally more similar to a (b)(3) class than to a (b)(2) class, the opt out protection of (b)(3) must be applied. This conclusion follows from differences in the natures of the (b)(2) and the (b)(3) class.[8] Subsection (b)(2) was "intended primarily to facilitate civil rights class actions, where the class representatives typically sought broad injunctive relief against discriminatory practices." *Penson,* 634 F.2d at 993. "The very nature of a (b)(2) class is that it is homogeneous without any conflicting interests between the members of the class." *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 256 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Subsection (b)(2) "by its terms, clearly envisions a class defined by the homogeneity and cohesion of its members' grievances, rights and interests." Rosen, Title VII Classes and Due Process: To (b)(2) Or Not To (b)(3), 26 Wayne L.Rev. 919, 923 (1980). Rule 23 itself provides for (b)(2) certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class." The import of this language is that the claims contemplated in a (b)(2) action are *class* claims, claims resting on the same grounds and applying more or less equally to all members of the class.

Further, the relief portion of subsection (b)(2) visualizes claims common to the entire class. The subsection provides for "appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Although the cases binding on this court clearly permit back pay as part of a class remedy so long as monetary relief is not the predominant relief sought, *see Pettway III; Bing v. Roadway Express, Inc.,* 485 F.2d 441, 448 (5th Cir.1973), it is important to emphasize that the relief portion of the subsection and its accompanying Advisory Committee Note contemplate conduct by defendants that applies generally to the class as a whole. The Advisory Committee Note states that subsection (b)(2) was not intended to "extend to cases in which the appropriate relief relates exclusively or predominately to monetary damages." Proposed Amendments to Rules of Civil Procedure for the United States District Courts, Advisory Committee Notes, 39 F.R.D. 102 (1966). The Advisory Committee cited cases enjoining violations of civil rights as "illustrative" of the types of cases properly cognizable under subsection (b)(2), *id.,* as did the reporter of the rules revision committee in his personal commentary on the 1966 amendments. *See* Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (Pt. 1), 81 Harv.L. Rev. 356, 389 (1967). *See also* 7A C. Wright & A. Miller, Federal Practice & Procedure § 1776, p. 35 (1972). The relief provisions

---

**8.** At base, the (b)(2) class is distinguished from the (b)(3) class by class cohensiveness .... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a (b)(2) class are generally bound together through "preexisting or continuing legal relationships" or by some significant common trait such as race or gender. Although the interests of the different members of a (b)(2) class are by no means identical the substantial cohesion of those interests makes it likely that representative members can adequately represent the interests of absent members and that the need for and interest in individual representation will be minimal. Under such circumstances, the contribution that individual notice can make to buttressing adequate representation is not great enough to warrant a mandatory procedural or constitutional requirement.
Note, Notice in Rule 23(b)(2) Class Actions for Monetary Relief: *Johnson v. General Motors Corp.,* 128 U.Pa.L.Rev. 1236, 1252–53 (1980) (footnotes omitted).

of the rule reflect the "need for homogeneity in the rights and interests of the class.... [This] recognizes that money damages are directly related to the disparate merits of individual claims and are not generally applicable to the claims of the class as a whole." Rosen, *supra* at 923. *See also* Note, Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2), 88 Yale L.J. 868, 875–76 (1979) (hereinafter cited as Antidiscrimination Class Actions).

By contrast, subdivision (b)(3) covers those cases seeking monetary relief in which a class action would save time, effort, and money and would promote uniformity without sacrificing procedural fairness. Common questions must predominate over any questions that affect individual parties, and the class device must be superior to all other available methods for the fair and efficient adjudication of the dispute. Unlike members of the (b)(2) class, members of the (b)(3) class are usually not united by an ongoing legal relationship or common trait that transcends the specific set of facts that gave rise to the litigation. *See supra* note 8. The drafters of Rule 23 envisioned the (b)(3) class as being "heterogeneous in nature. Rather than growing out of the same set of actions or policies as in the case of the (b)(2) class," the focus of (b)(3) is efficiency in adjudication. Rosen, *supra* at 923. *See also* Antidiscrimination Class Actions, *supra* at 876. Heterogeneity, and its attendant potential for diverging interests, necessitated special rules of procedure to protect absent members of the (b)(3) class. Individual notice to all class members was required by subsection (c)(2) of the class

action rule, *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974), and subsection (c)(2)(A) provided that class members may opt out of the (b)(3) class suit if they so desire.

Thus, in general terms, the rights and interests of class members were visualized as more likely to be homogeneous in a (b)(2) than in a (b)(3) class. The claims of the class representatives in a classic (b)(2) class are likely to be typical of and congruent with the claims of the class as a whole. Most important to our analysis, the procedural protections accorded to absent class members differ depending on whether the class is certified under (b)(2) or (b)(3). Unlike members of (b)(3) classes, class members of actions certified under (b)(2) ordinarily are not entitled to individual notice and typically do not have the right to opt out of the lawsuit. These differing levels of protection reflect the respective assumptions of cohesiveness underlying the two types of classes.[9] *See* Advisory Committee Note, 39 F.R.D. at 106 ("In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum"); *Penson,* 634 F.2d at 993–94 ("The theory underlying the less stringent notice requirements for Rule 23(b)(2) actions is that there is purportedly a greater degree of 'cohesiveness or unity in the class' than in 23(b)(3) actions, which minimizes the need for notice and a right to opt out"); *Johnson v. General Motors Corp.,* 598 F.2d at 437–48; *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d at 253 ("[T]he procedural protections of (b)(3), opting out and notice, are necessary because of the heterogeneity

**9.** There will be situations where the class is cohesive, or where the legal relationship of the members enable one or more to stand in judgment for all, and where the representatives are truly representative and faithful—a most important factor. In these and related situations we suggest that, although some notice to the members may be desirable and may be given as provided in (d)(2), a judgment should be res judicata as to all the class, even in the absence of notice, in the (b)(1) and (b)(2) situations when the requirements of Rule 23 have been satisfied. On the

other hand, in the (b)(3) type of class suit, where notice is mandatory, there is no jural relationship between the members. They are legal strangers related only by some common question of law or fact and with a right to opt out of the class. The mandatory notice under (c)(2) informs them of that right, and satisfies the presumed due process pre-condition to entering a judgment binding against them.

3B J. Moore, Moore's Federal Practice ¶ 23.55 (2d ed. 1981) (footnotes omitted).

of the (b)(3) class. They are unnecessary for the homogeneous (b)(2) class"); Rutherglen, Title VII Class Actions, 47 U.Chi.L.Rev. 688, 701 (1981); 3B J. Moore, Moore's Federal Practice at ¶ 23.45[2]. *See also supra* note 8. Opting out of a (b)(2) suit for injunctive relief would have little practical value or effect. Even class members who opted out could not avoid the effects of the judgment. A (b)(2) injunction would enjoin all illegal action, and all class members would necessarily be affected by such broad relief. *See* Note, Statutes of Limitations and Opting Out of Class Actions, 81 Mich.L.Rev. 399, 401 n. 8 (1983).

One commentator aptly summarized:

The explanation [for the differing levels of procedural safeguards] lies in the nature of the (b)(2) class and its basis of action. Because the interests and the relationship to the defendant as regards the alleged wrong are, by the very terms of the (b)(2) definition, substantially identical among all class members, notice that their rights are being litigated would add little or nothing. This is particularly true since the primary relief contemplated under (b)(2) is class-wide injunctive or declaratory relief and, by definition, the class comprises all those who will share in or be directly affected by the grant or denial of such relief. Thus, it was thought that those (b)(2) members who were not notified or given an opportunity to exclude themselves from the class were in no way deprived of due process since their claims rested on precisely the same grounds as all the other members and all the issues they would or could have raised were, in fact, adjudicated in the context of class. Too, their relief, if any—since it was of an injunctive nature—was also intended to be identical: a halt to the alleged wrongful actions or policies.

The (b)(3) class, on the other hand, since it was envisioned as heterogeneous, was recognized as pregnant with potential tensions and interest-antagonisms between class members. For this reason, notice was mandated for (b)(3) members, and it was required that they be given an opportunity to opt out of the class.

Rosen, *supra* at 925.

Former fifth and eleventh circuit cases acknowledge, albeit implicitly, that the rationale for not according procedural protections to absent class members is considerably weaker with respect to the monetary aspects of Title VII class actions, when interests of class members are most likely to diverge, than with respect to classwide injunctive relief. In *Johnson v. General Motors Corp.,* 598 F.2d 432 (5th Cir.1979), the former fifth circuit held that due process required individual notice before the personal pecuniary claims of absent class members could be barred, even though the case had been certified under (b)(2). The court reasoned that when "only equitable relief is sought in an action involving a cohesive plaintiff group such as a class of black employees at an assembly plant, the due process interests of absent members will usually be safeguarded by adequate representation alone." *Id.* at 437. By contrast, in cases where "individual monetary claims are at stake, the balance swings in favor of the provision of some form of notice." *Id.* at 438. *Accord Bogard v. Cook,* 586 F.2d 399 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979).

The case law binding on this court similarly employs a bifurcated procedure when victims of discrimination seek both injunctive and back pay relief under Title VII. *See Pettway IV,* 576 F.2d at 1210–13; *Baxter v. Sugar Refining Corp.,* 495 F.2d 437, 443–44 (5th Cir.), *cert. denied,* 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). At the first stage "the *class* must demonstrate a prima facie case of employment discrimination." *United States v. United States Steel Corp.,* 520 F.2d at 1053 (emphasis in original). This liability stage stresses claims common to the class as a whole, and if liability is found, results in injunctive or declaratory relief. The focus in Stage I is "upon the class, as opposed to any particular putative member." *Id.* at 1054. The class nature of Stage I suggests that the

procedures associated with (b)(3) classes, procedures designed to protect absent class members, would serve little purpose. If a class makes a prima facie showing of discrimination under Stage I, then it is entitled to move on to Stage II with the presentation of individual back pay claims. *Id.* At this stage, the court should resolve whether a particular employee is in fact a member of the covered class, has suffered financial loss, and thus is entitled to back pay or other appropriate relief. *Baxter,* 495 F.2d at 444. This bifurcated procedure reflects a sensitivity toward the heterogeneous quality of the claims resolved at the monetary relief stage and evinces a recognition of the need to protect the interests of absent class members at that stage. *See generally* 3B J. Moore, Moore's Federal Practice ¶ 23.45[1], at 23–322 (court should bifurcate back pay cases, creating a (b)(2) class for injunctive relief and a (b)(3) class for monetary relief); [10] Barnard, Title VII Class Actions: The "Recovery Stage," 16 Wm. & Mary L.Rev. 507, 526–27 (1975); Edwards, The Back Pay Remedy in Title VII Class Actions: Problems in Procedure, 8 Ga.L.Rev. 781, 797 (1974). The hearings mandated by Rule 23(e) in settlements involving back pay are, for all practical purposes, the same as Stage II proceedings under the bifurcated approach.

Finally, those cases declining to allow opting out at the recovery stage of (b)(2) actions seeking back pay have proceeded on the assumption that the class was cohesive. For example, in the seminal case of *Wetzel v. Liberty Mutual Insurance Co.* Judge Rosenn reasoned that "mandatory notice is required in (b)(3) actions for the effective operation of the 'opt out' provision, which is essential to protect the interests of individuals in the heterogeneous group. The 'opt out' procedure, however, is not necessary for the protection of the homogeneous (b)(2) class.... 'In the degree that there is cohesiveness or unity in the class ... the need for notice to the class will tend towards a minimum,' " 508 F.2d at 255, *quoting* Advisory Committee Note, 39 F.R.D. at 106. The court stressed that "the cohesive characteristics of the class are the vital core of a (b)(2) action." 508 F.2d at 251. *See also Penson,* 634 F.2d at 994 (theory of (b)(2) class cohesiveness has "broken down with the advent of the 'hybrid' Rule 23(b)(2) class action in which individual monetary relief for class members, typically back pay, is sought in addition to classwide injunctive or declaratory relief"); *Officers for Justice v. Civil Service Commission,* 688 F.2d at 634–35; Note, Antidiscrimination Class Actions, *supra* at 876 n. 46 ("insofar as (b)(2) class actions are identified by a mere 'common claim ... susceptible to a single proof and subject to a single injunctive remedy', it would seem that the complexity of administering class-wide back pay relief would transform a (b)(2) class action into a (b)(3) action"), *quoting Senter v. General Motors Corp.,* 532 F.2d 511, 525 (6th Cir.1976). A back pay class in which all members are affected equally by a settlement would, of course, be sufficiently homogeneous to obviate any need for an opt out protection. *Compare Pettway III,* 494 F.2d at 261 ("when the class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth the quagmire of hypothetical judgment ... a classwide approach to the measure of back pay

---

10. [It is] possible to create hybrids in given cases. Since in theory there should be no hard requirement that (b)(2) be mutually exclusive, and since subpart (c)(4)(A) allows an action to be maintained "with respect to particular issues," the fact that damages are sought as well as an injunction or declaratory relief should not be fatal to a request for a (b)(2) suit, as long as the resulting hybrid case can be fairly and effectively managed. On the other hand, the policies underlying the requirements of (b)(3) should not be subverted by recasting and bifurcating every class suit for damage as one for final declaratory relief of liability under (b)(2), followed by a class suit for damages under (b)(3). 3B J. Moore, Moore's Federal Practice, *supra* at ¶ 23.40[4], p. 23–308 (footnotes omitted). *See also* Rutherglen, Notice, Scope and Preclusion in Title VII Class Actions, 69 Va.L.Rev. 11 (1983) (arguing that Title VII class actions fit under both subdivisions (b)(2) and (b)(3) and that courts should certify them as hybrid class actions under both subsections).

is necessitated"); *United States v. United States Steel Corp.*, 520 F.2d at 1055 (when job bidding procedures and lines of progression allow a reasonably accurate historical reconstruction of the evaluation of the workforce, then there is a reasonable basis for calculating individual entitlement to back pay); *Women's Committee for Equal Employment Opportunity v. National Broadcasting Co.*, 76 F.R.D. at 178 ("[w]here determinations of individual damages is speculative, as in this case, a classwide approach to back pay is appropriate"); *Laffey v. Northwest Airlines, Inc.*, 366 F.Supp. 763 (D.D.C.1973) (airline violated Title VII by systematically paying stewardesses lower salaries and pensions than male pursers for equal work; pay claim equalization would thus award similar compensation to all members of the affected class).

Although the assumption of monetary relief class cohesiveness may be justified in many Title VII actions brought under subsection (b)(2), it is not justified in this case.[11] The present case is one in which "the merits of back pay claims are uniquely individual to each class member. Such relief varies in relation to each class member's personal injury from the discriminatory policies of the employer; accordingly, each member must establish on an individual basis the amount of relief due." Rosen, *supra* at 934. The positions taken by the proponents of this settlement impale them on both horns of a dilemma: they must simul-

taneously argue that the class was sufficiently cohesive to justify (b)(2) treatment, yet also that the unique claims of the named plaintiffs justified the disparate distribution of the back pay award. The proponents stress the individualized nature of the monetary relief claims. They contend that the class representatives possess unique, atypical claims, claims not in tandem with the claims common to the class as a whole. Class representative Deborah King had a claim of a discharge which lasted three weeks before the union secured her reinstatement. Her maximum back pay recovery would have been less than $600 for that three weeks, but King was to receive $3,028 under the terms of the settlement. The district court stated that it approved the payment because King was discharged following a "heated verbal exchange with racial overtones." Counsel for the class likewise testified at the fairness hearing that Charles Williams had been subjected to a series of discriminatory actions by his white foreman. Under the terms of the consent decree, Williams would receive $1,432 rather than $650, the maximum amount he would be eligible to receive as a co-equal member of the back pay subclass. The difference represented his compensatory or punitive damages for the particular abuse he endured. Similarly, the attorney for the class justified the higher awards to Hannalore Watson, Thelma Jackson, Deborah King and Gloria Holmes on

11. Commentators have argued that the assumption of class cohesiveness is seldom, if ever, met in Title VII cases:

The final argument for certifying Title VII class actions under subdivision (b)(2)—that Title VII classes are more cohesive than other classes—rests upon an unfounded assumption. The argument asserts that victims of alleged employment discrimination have an overriding common interest in ending discrimination, or at least a greater common interest than victims of other forms of illegal conduct. At best, this assertion is unsupported and, at worst, it ignores the divergent individual interests of Title VII plaintiffs. Class members in a Title VII class action have common interests in obtaining injunctive relief against future discrimination, but they also have individual interests in obtaining compensatory relief for past discrimina-

tion. Their common interests are no stronger than those of class members in actions for similar relief under other statutes. Moreover, notice and the right to opt out assure adequate representation of common interests as well as divergent interests. Notice allows class members an opportunity to attempt to intervene if they are dissatisfied with representation of the class in any respect, and the right to opt out allows them to express their dissatisfaction by abandoning the class action entirely. The procedures in (b)(3) class actions complement determination of scope in assuring adequate representation. They may also allow broader definition of the class than in (b)(2) class actions without jeopardizing adequacy of representation.

Rutherglen, Notice, Scope and Preclusion in Title VII Class Actions, 69 Va.L.Rev. 11, 26–27 (1983) (footnotes omitted).

the basis of claims common only to them: each had been fired after requesting transfer to one of the more desirable Continental Can plants. All were reinstated, but none received full back pay. Spurgie Johnson was the only class member who was the senior bidder on a posted job which was awarded to a junior (white) employee. Donnie Harris was the only class member with a claim of racially discriminatory denial of training. Annie Johnson applied for a job with Continental Can and took and passed its employment test. Ostensibly because of an anti-nepotism policy, she was not employed by the company. Discovery revealed that the company had no such policy and that several white married couples were employed at the Birmingham plants.

This case involves a finite and relatively small lump sum fund that must be divided among a relatively large class. *Compare Cotton v. Hinton,* 559 F.2d at 1331 (settlement provided for broad injunctive relief and an unlimited back pay fund to ensure adequate compensation for every injured class member). Allocation of this fund is a zero sum situation: a gain to one party entails a corresponding loss for the other parties. Such a situation may generate antagonistic interests and conflicting concerns. Because "the fundamental justification for not requiring notice to absent class members, nor providing the opportunity to be heard or to exclude themselves from the class, is that the class' cohesive characteristics—its identity of rights and interests—bind the class together so that identical (or at least similar) relief is appropriate," *Rosen, supra* at 934, and because that justification is not present under the facts of this case, we hold that the right to opt out of the class, normally accorded only to (b)(3) class members, must be extended to all members of this (b)(2) class.

We predicate the above analysis on the federal class action rule rather than on the mandates of the due process clause. Although class actions must comport with constitutional due process, our construction of subsection (b)(2) obviates the need for a due process inquiry. The Supreme Court employed a similar approach in *Eisen* by basing its holding that (b)(3) required individual notice to all class members on Rule 23(c)(2) rather than on the due process clause. 417 U.S. 156, 177 (1974). *See* 3B J. Moore, Moore's Federal Practice ¶ 23.55, p. 23–454. The *Eisen* Court adopted the position that "the notice provisions of Rule 23 must be interpreted so as to bring the conduct of class litigation within the minimum requirements of due process." *Johnson v. General Motors Corp.,* 598 F.2d at 436. Similarly, the former fifth circuit in *Penson* held that a district court may properly order a right to opt out of a (b)(2) class based on the court's discretionary power. 634 F.2d at 993. In the present case, we conclude that the trial court's failure to allow opting out was an abuse of discretion.

(3)

#### Conclusion

Based on the record before us, we hold that the settlement proponents have not overcome the facial unfairness of the disparate distribution of this back pay award. We further hold that on remand the district court must "provide those claimants who decide to opt-out of the settlement with an opportunity to assert their individual claims in this action." *Pettway IV,* 576 F.2d at 1220. Such claimants must be permitted to exclude themselves from the class and must be given an opportunity to prove entitlement to a larger individual award in the same court that hears the claims of the class.

Courts are not permitted to modify settlement terms or in any manner to rewrite the agreement reached by the parties. *Pettway IV,* 576 F.2d at 1172; *Cotton v. Hinton,* 559 F.2d at 1331–32. No party in this case wishes to disturb the $43,775 lump sum payment itself. We note, however, that the Continental Can Company agreed to that figure based on the assumption that the settlement would bind all members of the class. Our holding permitting opting out by class members undermines that assumption. We cannot say that Continental Can would have agreed to the same settle-

ment terms, or to any settlement terms, had those terms incorporated the opt out clause which we today impose. On remand, the district court must ascertain whether allowing opting out will expose the company to additional liability. If so, then the company will have the option of abrogating the settlement agreement with the class and of once again engaging in settlement negotiations or litigation.

REVERSED and REMANDED.