**Edgar H. BATTLE etc., et al., Plaintiffs,**

**James L. Taylor, et al., Plaintiff–Intervenors,**

**v.**

**LIBERTY NATIONAL LIFE INSURANCE COMPANY, et al., Defendants.**

Civ. A. No. 70–H–752–S.

United States District Court, N.D. Alabama, S.D.

Aug. 6, 1991.

Francis H. Hare, Hare, Wynn, Newell & Newton, George R. Stewart, Edward L. Hardin, Jr., Claude M. Moncus, Hardin, Stuart, Moncus & Noojin, Birmingham, Ala., C. Neal Pope, Phenix City, Ala., Richard H. Gill, Copeland Franco Screws Gill, Montgomery, Ala., for plaintiff.

O.S. Burke, Greensboro, Ala., J. Richard Carr (Retired), Attalla, Ala., J.L. Chestnut, Jr., Chestnut, Sanders & Sanders, Selma, Ala., U.W. Clemon, Adams, Baker & Clemon, Birmingham, Ala., John B. Crawley, Troy, Ala., Jack Drake, Drake & Knowles, University, Ala., David M. Enslen, Nolen & Enslen, Fayette, Ala., J. Pelham Ferrell, Ferrell & Bennett, Phenix City, Ala., Fred D. Gray, Gray, Seay & Langford, Tuskegee, Ala., Thomas K. Jefferson, Huntsville, Ala., Alto V. Lee, III, Lee & McInish, Dothan, Ala., Duncan Manly, Rives, Peterson, Pettus, Conway, Elliott & Small, Birmingham, Ala., Edmon McKinley, Thomasville, Ala., John W. Parker, Tonsmeire, McFadden & Rile, Mobile, Ala., Don B. Long, Jr., William D. Jones, III, Johnston Barton Proctor Swedlaw & Naff, Birmingham, Ala., John A. Russell, III, Hubbard & Waldrop, J.J. Spiro, Tuscaloosa, Ala., George P. Walthall, Jr., Walthall & Cleveland, Prattville, Ala., Augusta E. Wilson, Mobile, Ala., for plaintiff-intervenors.

Ralph B. Tate, Spain, Gillon, Riley, Tate & Etheredge, John S.P. Samford, Ira L. Burleson, Andrew Campbell, Leitman Siegal & Payne Campbell, Birmingham, Ala., for defendants.

Edward Still, Thomas B. Leonard, III, Birmingham, Ala., for objectors-intervenors.

Thomas A. Ansley, Jonathan H. Waller, Charles A. McCallum, III, Haskell Slaughter & Young, Birmingham, Ala., for Rideout's–Brown–Service.

Polly White, pro. se. Jack Lee d/b/a Jack Lee Funeral Home, Jack Lee & Sons Funeral Home, Inc., pro se.

## ORDER

MYRON H. THOMPSON, Chief District Judge: *

This lawsuit, filed in 1970 on behalf of a class of Alabama funeral homes, has clung to life with a tenacity which, if it could be matched by humans, would undoubtedly have obviated the need for the "burial insurance" that has been the subject of contention in the case for over 20 years. Despite a final consent decree entered in 1977, the cause is now again before the court on a motion for relief from judgment, brought pursuant to Federal Rule of Civil Procedure 60(b)(4) by several holders of such burial insurance policies issued by defendant Liberty National Life Insurance Company. Movants specifically assert that several key provisions of the 1977 consent decree are "void" as to them and other similarly situated absent members of a class of policyholders because it was entered without providing adequate prior notice to them, in violation of their rights to procedural due process. Liberty National has objected, claiming that the Rule 60(b) motion is due to be denied as a matter of law.[1] The court has stayed discovery pend-

---

* Honorable Myron H. Thompson, Chief District Judge for the Middle District of Alabama, sitting by designation.

1. Liberty National, together with the original plaintiff class of funeral directors in this lawsuit as well as several of the class's members, Rideout's–Brown–Service, Inc., and Aubrey Carr and Carr Service Enterprises, Inc., have opposed the Rule 60(b) motion. Carr Service is the funeral home that was responsible for the funerals of burial policyholders James J. Taylor and Laura F. Taylor, whose children are among the indi-

viduals that have brought the Rule 60(b) motion now before the court. This funeral home was also one of the defendants in a state court suit brought by the Taylors' heirs. *See* section I(D) of the court's order. However, for the sake of simplicity and because their positions and arguments with respect to the motion mirror those of Liberty National, the court does not treat the funeral directors separately in this order, but refers to the non-movants collectively as "Liberty National." Furthermore, in order to avoid confusing Rideout's–Brown–Service, Inc., an existing funeral home, with Brown–Service Fu-

ing a determination of the legal sufficiency of the Rule 60(b) motion.[2] For the reasons explained below, the court finds that, even accepting movants' allegations as true, they were not denied due process in the adoption of the 1977 consent decree. Accordingly, the court concludes that the Rule 60(b) motion should be denied.

## I.

### A. *The Burial Policies*

Liberty National began issuing burial insurance policies to residents of Alabama in 1944.[3] Individuals purchasing such insurance were obligated to make small weekly payments for a number of years until their policies were paid in full.[4] In return, Liberty National contractually agreed to provide certain funeral benefits to the policyholder on the event of her death. The benefits available depended in part on which of the three types of burial policies the deceased had selected. The most common policy, whose "retail value" Liberty National represented to policyholders as being $300,

was one that guaranteed the purchaser a wooden casket. The second category of policies, with a retail value of $600, provided instead for a metal casket.[5] Third and finally, the company also marketed policies under which the insured would receive and be buried in a "vault."[6] The retail value of almost all of the vault policies was $100.[7] A substantial proportion of the vault policies specified that the insured would be provided a certain type of metal or concrete vault. These were not the only variations among the types of burial insurance sold by Liberty National; under the two varieties of casket policies, Liberty National also promised to furnish such merchandise and services as a burial suit or dress, embalming and preparation of the deceased's remains, use of the funeral parlor, assistance in conducting the service, use of a funeral coach to carry the deceased's family, and transportation of the remains within certain distances. However, holders of vault policies were not entitled to receive such funeral services in addition to the vault. As a result, many if

neral Homes Company, Inc., a subsidiary of Liberty National, *see* section I(A), *infra,* the court hereinafter refers to the former simply as "Rideout's."

**2.** Carr and Carr Services Enterprises have filed a "Motion to Strike" the Rule 60(b) motion, arguing, as Liberty National does in its "Objection," that the Rule 60(b) motion lacks merit on its face. Accordingly, the court has evaluated the Rule 60(b) motion under a standard similar to the one applicable to a motion to dismiss a complaint. A complaint should not be dismissed on a motion under Rule 12(b)(6) unless " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989), *quoting Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). *Accord Luckey v. Harris,* 860 F.2d 1012, 1016 (11th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 2562, 109 L.Ed.2d 744 (1990). Accordingly, in section I of this order, the court, unless otherwise indicated, articulates the facts relevant to the Rule 60(b) motion in the light most favorable to movants. Readers interested in a further discussion of the long and tangled history of this litigation are referred to the following published decisions: *Battle v. Liberty National Life Ins. Co.,* 493 F.2d 39 (5th Cir.1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Taylor v. Liber-*

*ty National Life Ins. Co.,* 462 So.2d 907 (Ala. 1984); *Battle v. Liberty National Life Ins. Co.,* 660 F.Supp. 1449 (N.D.Ala.1987) (Hancock, J.); *Battle v. Liberty National Life Ins. Co.,* 877 F.2d 877 (11th Cir.1989).

**3.** From the 1920's until it merged with Liberty National in 1944, Brown–Service Insurance Company had issued such policies.

**4.** The amount of each policyholder's weekly payments was tied to the retail value of her policy.

**5.** With both kinds of casket policies, the casket itself constituted the bulk of the value of the available benefits. For example, the wooden casket policies, with a retail value of $300, promised the holder a casket with a retail value of $250.

**6.** Despite the different nomenclatures used throughout this litigation, the court hereafter refers to "casket" policies and "vault" policies as the two types of "burial insurance" or "burial policies" offered by Liberty National.

**7.** A small portion of the burial policies had retail values different from these usual figures. For example, fewer than 10% of the vault policies had a retail value of either $150 or $200. Similarly, a small percentage of the casket policies were valued by Liberty National at between $225 and $800, other than $300 or $600.

not most of those persons who had purchased a vault policy had also bought a burial policy of some sort to supplement it.

Despite the use of the phrase "retail value" in the policies, benefits equivalent to those guaranteed by each policy usually could be purchased at retail from a funeral home only at a price greater than the retail value of the policy. In other words, the family of an uninsured deceased would likely have had to pay a funeral home more than $300 to obtain a casket and other funeral benefits identical to the ones guaranteed an insured under Liberty National's $300 wooden casket policy. The difference was greatest in the case of the vault policies; at the time of the 1977 consent decree, it appeared that the "$100" vault described in the vault policies was being sold at retail by funeral directors for approximately $200 to $300.[8]

In order to satisfy its obligations under these policies, Liberty National contracted for its wholly-owned subsidiary, Brown–Service Funeral Homes Company, Inc., to provide such funeral benefits.[9] Brown–Service, in turn, maintained agreements with various funeral directors throughout Alabama, which obligated the directors to furnish merchandise and services to Liberty National policyholders at stipulated prices to be paid by Brown–Service.[10] Accordingly, policyholders could only obtain benefits under their policies from such "authorized" funeral homes. Thus, if the family of a deceased insured opted to use an unauthorized funeral home, they would receive only a casket under the casket policies, and no benefits whatsoever if the deceased had held only a vault policy. Moreover, were a policyholder to die outside Alabama or more than 35 miles from the nearest authorized funeral director, she would be entitled under the terms of the policy only to the cash equivalent of a percentage of her policy's retail value, 50% in most cases involving casket policies.[11]

None of the burial policies, however, directly addressed the issue, later to be sharply disputed, of Liberty National's obligations in the event that the family of a deceased policyholder requested from an authorized funeral home merchandise or services beyond those guaranteed under the policy. Such a contingency, known as an "oversale," occurred in more than 80% of the funerals of individuals covered by Liberty National burial policies, usually where the family selected a more expensive casket than that provided for by the burial insurance. The practice in the funeral industry in Alabama prior to this litigation was for a funeral home to provide a credit in the event of an oversale, usually in the amount of the retail value of the burial policy.[12] However, despite this custom, Liberty National and the movants, much like the parties to the original litigation, sharply disagree about what the scope of the company's legal obligations were when an oversale occurred prior to the 1977 con-

---

**8.** Thus the phrase "retail value" as used in this order, refers to the value of a burial policy as represented to purchasers by Liberty National and does not necessarily denote the actual market value or price of the merchandise or services available under the policy.

**9.** In its early years in the burial insurance business, Liberty National and Brown–Service actually owned and operated a number of funeral homes. However, this practice ceased after 1954, as a result of an antitrust suit brought by the United States against Liberty National.

**10.** In return for providing the merchandise and services guaranteed under the policies, authorized funeral homes received fees from Brown–Service substantially less than the retail values of the policies. *See Battle v. Liberty National Life Ins. Co.,* 493 F.2d 39, 46 (5th Cir.1974) ("if the policy value is $300, the director receives $90; if the policy value is $600, the director receives $180), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).

**11.** Thus the heirs of a holder of a wooden casket policy, with a retail value of $300, would receive a payment of $150 if the individual died outside the prescribed areas. In the case of a $100 vault policy, Liberty National would provide a cash payment of $75.

**12.** For example, when the family members of a deceased covered by a $300 wooden casket policy chose to purchase a different casket, costing $800 for example, they would be billed by the funeral home for the cost of this casket plus the cost of all services provided, but would receive a $300 discount off the total price. Thus, if the services were priced at $500, the family would pay a total of $1000 [($800 + $500) − $300].

sent decree. According to Liberty National, it was at most required to provide a cash payment or credit equal to one-half the retail value of the policy, as it did in cases in which the policyholder died out of state or more than 35 miles from an authorized funeral director.[13] However, movants have taken the position that, where a family opted for a more expensive funeral than the one provided for under the deceased's burial policy, Liberty National was legally obligated to allow a credit for the retail value of the items oversold—usually the casket—and to furnish all other merchandise or services guaranteed under the policy.[14]

Prior to the 1977 consent decree, the parties to the original litigation sharply disagreed as to the exact nature of Liberty National's contractual liability under the vault policies. Although it appeared to be a common practice for funeral directors to transport and install vaults provided under the burial policies for free or for a nominal charge, the parties disputed whether such a service was in any respect covered under the policies. Moreover, because some of the vault policies referred to a specific type of vault and others referred simply to a $100 vault or a vault with a value of $100, there was also apparently some disagreement as to whether the holder was entitled to a vault of the kind valued at $100 at the time he purchased the policy, or, because the price of vaults had since increased, a vault of lesser quality, valued at $100 at the time of his death.

By 1970, two years prior to the time Liberty National ceased selling this form of

funeral benefit policy, 50% of the persons who died each year in Alabama were covered by such policies, and the vast majority of Alabama funeral homes maintained contractual relationships with Brown–Service.[15] *See Battle v. Liberty National Life Ins. Co.*, 493 F.2d 39, 45 (5th Cir.1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975). By 1977, when final judgment was entered in this case, approximately 3.5 million such policies were outstanding, owned by about 1.5 million Alabamians.[16] Liberty National's total liability on these policies was in the neighborhood of $1.5 billion.

### B. *The Original Lawsuit*

Discontented with the control over the funeral industry exercised by Liberty National and Brown–Service and the limited profitability of providing funerals to burial policyholders, a class of authorized and unauthorized funeral home owners filed suit against both companies in 1970.[17] In *Battle, et al., v. Liberty National Life Ins. Co., et al.*, CV 70–H–752–S, the owners charged these defendants with violating federal antitrust statutes and sought both damages and injunctive relief. The complaint in *Battle* accused Liberty National and Brown–Service of price fixing, monopolizing trade, and engaging in illegal tying arrangements, in violation of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and the Clayton Act, 15 U.S.C.A. § 14. The funeral homes sought approximately $200 million in damages and systemic injunctive relief against Liberty National and Brown–Service.[18] A suit by funeral home owners

---

**13.** Thus, in the example offered in note 12, *supra*, the family would receive a discount of only $150, and would pay a total of $1150 for the funeral.

**14.** Therefore, in the hypothetical in note 12, *supra*, the family would receive a discount of $250—the retail value of a wooden casket, according to the policy—off the price of the more expensive casket, and would still receive, as benefits under the funeral policy, all other services. In this scenario, the family would be liable to the funeral director only for a total of $550 ($800 − $250).

**15.** After 1972, the company sold only policies that paid cash benefits upon the holder's death,

known as "funeral expense" policies. Such policies are not the subject of this litigation.

**16.** As the court has noted, individuals often purchased multiple policies to increase the burial benefits—either the quality of the casket or the funeral services—available to them when they died.

**17.** When the case was filed, the class included approximately 300 owners of 400 funeral homes.

**18.** The funeral homes requested an injunction (1) annulling all outstanding contracts between funeral homes, and Liberty National and

virtually identical to *Battle, Holman, et al., v. Liberty National Life Ins. Co., et al.*, CV 76–H–0813–S, was initiated in this court in June 1976. Between 1970 and 1977, the *Battle* case was extensively litigated.[19]

In 1972, the third in a trilogy of class actions against Liberty National and Brown–Service, this one on behalf of burial policyholders, was filed in this court. Styled *Campbell, et al. v. Liberty National Life Ins. Co., et al.*, CV 72–H–569–S, the complaint essentially reiterated the antitrust claims presented in the *Battle* suit, arguing that policyholders had suffered injury from defendants' antitrust violations through higher prices charged by funeral directors. In addition, the *Campbell* plaintiffs charged defendants with fraud, on the basis that the actual amount paid by Brown–Service to a funeral director for the benefits conferred under any of the burial policies fell far short of the stated "retail value" of such a policy.[20] With respect to their antitrust claims, the policyholders requested the same extensive injunctive relief as the plaintiffs in *Battle*, and also sought $60 million in treble antitrust damages. As for the fraud claims, the complaint in *Campbell* asked that Liberty National and Brown–Service be required to: (1) "reveal to prospective purchasers of burial insurance ... the amounts actually paid out by defendants under said policy"; (2) "return a part of the premium to plaintiffs and ... [reduce] all future premiums ... in accordance with service and materi-

als rendered under the policies"; (3) "amend[ ]" the policies "to provide for payment of cash benefits in the face amount" of the policies "in lieu of requiring beneficiaries ... to accept the funeral and burial services" specified in the policies; and (4) pay policyholders "punitive and compensatory damages" in the amount of $60 million.

Shortly before *Campbell* was filed in this court, a similar action by policyholders, *Johnson v. Liberty National Life Ins. Co.*, was initiated against the same defendants in the Circuit Court of Conecuh County, Alabama. Although that suit, like *Battle*, was actively pursued through discovery and other preliminary proceedings, the *Campbell* suit lay dormant until 1975, when defendants filed a "Motion to Determine Propriety of Class Action Under Rule 23(c)(2)."[21] In this motion, Liberty National and Brown–Service opposed the certification of a plaintiff class, but argued, in the alternative, that if the case was to proceed as a class action, then Federal Rule of Civil Procedure 23 required that the named plaintiffs and their counsel provide notice of the suit by first class mail to all members of the class of policyholders, estimated at 2 million persons. Asserting that the companies could, with reasonable effort, compile and furnish the plaintiffs with a listing of the names and addresses of all such policyholders, Liberty National and Brown–Service concluded that the court should refuse to certify a plaintiff class unless the named plaintiffs and their counsel indicated they were prepared to assume

---

Brown–Service; (2) requiring Liberty National to divest itself of Brown–Service; (3) forbidding Liberty National and Brown–Service from engaging in the funeral home business; and (4) requiring Liberty National and Brown–Service to pay funeral homes a market rate for merchandise and services provided by the homes under burial policies.

**19.** *See Battle v. Liberty National Life Ins. Co.*, 660 F.Supp. 1449, 1452 (N.D.Ala.1987) (Hancock, J.). The district court initially dismissed that lawsuit, pursuant to Federal Rule of Civil Procedure 12(b)(6), on various grounds relating to the viability of plaintiffs' antitrust allegations. However, the Fifth Circuit reversed and returned the case to the district court for further proceedings. *See Battle v. Liberty National Life*

*Ins. Co.*, 493 F.2d 39 (5th Cir.1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).

**20.** *See* note 10, *supra*. The policyholders' state law fraud and misrepresentation claims are discussed in only three pages. The remaining 38 pages of the complaint are devoted to their antitrust allegations.

**21.** In the fairness hearing on the 1977 consent decree, the court observed that *Campbell* was filed as a "holding action in the event something happened adversely to the state court lawsuit." Prior to the 1975 proceedings, the only action taken by either side in *Campbell* involved several dispositive motions filed by defendants shortly after the suit was initiated in 1972. The court never ruled on these motions.

the expense, estimated at $400,000, of providing mail notice to the policyholder class. At a hearing on this motion, counsel for the policyholder class asked the court to stay the *Campbell* case for three months, pending further proceedings in *Battle*. The court apparently issued no ruling on either the plaintiffs' or the defendants' motions.

### C. *The Settlement*

In 1977, attorneys for Liberty National and Brown–Service and attorneys for the funeral director classes and the policyholder classes initiated settlement negotiations covering all of these lawsuits. In September 1977, they entered into an agreement to settle the three actions pending in this court, *Battle, Holman,* and *Campbell,* and dismiss with prejudice the state court case, *Johnson.* Procedurally, this compromise provided that the federal lawsuits would be consolidated and two temporary settlement classes created, one consisting of the funeral home owners and the other of burial policyholders. The substantive provisions of the proposed settlement require some discussion because they are both complex and crucial to the claims raised in the Rule 60(b) motion now before the court. First, the agreement generally provided the funeral home owners with much of the injunctive relief requested in the various suits and aimed at loosening the control Liberty National and Brown–Service had previously exercised over the merchandise and services the funeral homes offered and the prices they charged. Most significant-

ly, the two companies agreed to allow any funeral home that met basic health and other state regulatory standards to service its burial policies—in other words, to become an "authorized" funeral home.[22] The settlement also called for Liberty National and Brown–Service to pay a sizable amount in attorney's fees to plaintiffs' counsel in the various lawsuits.[23]

Furthermore, and most salient to the court's present inquiry, the agreement clarified or reformed the liabilities of Liberty National and Brown–Service, the corresponding rights of casket and vault policyholders, and, by extension, the obligations of authorized funeral directors to customers in the case of funerals covered by burial insurance. First, it resolved the uncertainty that had attended "oversales" by adopting what had been the customary practice; thus the settlement provided that in the event the family of a deceased policyholder chose more expensive merchandise or services than were available under a policy, the funeral director would charge the family for all such funeral benefits, but discount the retail value of the policy.[24] Second, the settlement provided that holders of vault policies would be entitled not to an actual vault, but only to a cash payment equal to the retail value of the policy, regardless of where they died or whether their funeral was handled by a home affiliated with Brown–Service.[25]

Pursuant to the settlement agreement, the court consolidated the four lawsuits

---

**22.** In addition, the settlement specifically obligated Brown–Service to increase the fees funeral directors received for providing benefits under a burial policy to one-third of the stated retail value of the policy, and also created a mechanism to allow funeral directors to share in some of the profits henceforth earned by Brown–Service.

**23.** Attorneys for the plaintiffs and plaintiff-intervenors in *Battle* were to receive approximately $1.25 million. Lawyers in *Campbell* and *Johnson* would be paid $100,000.

**24.** If the holder of a casket policy died outside Alabama or more than 35 miles from an authorized funeral director, she would, as before the settlement, receive a cash payment equal to one-half the stated retail value of the policy. Similarly, if the family of an insured who died

within a prescribed area opted not to use an authorized funeral director, they would, as before, be entitled only to the casket guaranteed by the policy.

**25.** From the standpoint of policyholders, the agreement would bring about several other, more minor changes, including court supervision to ensure the quality of the caskets provided under the policies, and an upgrading to $300 of burial policies with values less than $300, and to $600 of those with values between $300 and $600. Furthermore, the provision permitting more funeral homes to become agents of the defendant companies would also indirectly benefit the policyholder class, to the extent it fostered an increase in the number of authorized funeral homes and thus avoided situations in which a covered policyholder died more than 35 miles from the nearest authorized home.

described above under the heading of *Battle*, established two temporary settlement classes consisting, respectively, of funeral directors and burial policyholders, and tentatively approved the agreement pending a fairness hearing. The settlement agreement had essentially left the issue of notice to members of the funeral director and policyholder class in the hands of the district judge.[26] Accordingly, the court certified the funeral director class under Federal Rule of Civil Procedure 23(b)(3), determined that the names and addresses of the approximately 350 members of this class could be "ascertained through reasonable efforts," and that the "best notice practicable" to the funeral directors was "written notice by mail." As for the policyholder class, the court determined that it met the requirements of Rule 23(b)(2), that it included more than one million members whose "names and addresses cannot be ascertained through reasonable effort," and that the "best notice practicable" for such policyholders would be "written notice" to be delivered by each agent of Liberty National in the course of the agent's regular weekly visits to collect premiums from policyholders, for a period of four consecutive weeks beginning at least 45 days prior to the fairness hearing. The court, however, did not address the question of notice to "paid-up" policyholders who were no longer required to tender weekly premiums to Liberty National and who, as result, no longer received visits from the company's agents.

The court approved a five-page notice of the settlement, which was subsequently distributed by Liberty National agents to policyholders during collection visits and other, additional contacts with those class members who were still paying premiums on their burial policies. This notice summarized the nature and history of the litigation, informed policyholders that the parties had agreed to a settlement, described its major provisions, and informed class members that they could file written objections to the settlement with the court and orally offer comments on the agreement at the fairness hearing, whose time and place were specified in the notice.[27] Specifically, the notice contained the following information about the settlement term regarding "oversales": "If funeral merchandise and services are purchased for the burial of the deceased insured, in addition to such services and merchandise as provided in the policy, the policyholder shall receive credit on the funeral bill for the full retail value of the benefits stated in the policy." As for the agreement on the rights of vault policyholders, the settlement stated: "Liberty National shall be required to perform the vault policies by paying in cash the retail value thereof stated in the policy in lieu of furnishing the vault otherwise provided." Finally, the notice informed recipients that if the proposed settlement were approved, a judgment would be entered foreclosing all claims "asserted or which might have been asserted in this class action." Unlike members of the funeral director class, policyholders were not afforded the chance to opt out of the settlement class.

Although the court's order provided for no formal notice by publication, several televisions stations and newspapers ran stories on the settlement prior to the fairness hearing. However, these reports varied widely in the degree to which they accurately communicated the relevant provisions of the settlement. Moreover, with one exception, all the stories on the settlement were printed or broadcast in Birmingham, although members of the policyholder class resided throughout the state.

Both before and after the December 1977 fairness hearing, the court received and

---

**26.** The agreement provided only that "[n]otice shall be given as directed by the Court to members of the classes ... pursuant to the provisions of [Federal Rule of Civil Procedure] 23," and at defendants' expense. However, the defendants reserved the right to rescind their agreement to the settlement, were the court to determine that class members were entitled to opt out of the settlement and should a "substan-

tial" proportion of the class choose to so exclude themselves.

**27.** The notice also provided recipients with the names and addresses of the various plaintiffs' counsel, but specifically instructed policyholders to direct any inquiries about the case to Liberty National.

considered objections to the settlement by over 1,400 policyholders. Most of these class members were represented by one of two attorneys, each of whom also orally presented comments about the agreement to the court at the hearing. In addition, counsel representing the various parties to the litigation addressed the court and the approximately 200 persons in attendance at the hearing, with respect to the history of the litigation, the process by which an agreement was reached, and the substance of the settlement. A number of the policyholders in the audience later presented complaints and questions about the settlement to the court. Of the various written and verbal communications to the court, several dealt directly with the oversale provisions of the settlement, and many more were directed to the alteration in the rights of vault policyholders.

In January 1978, the court approved the settlement and entered final judgment in accordance with its provisions. In this judgment, the court found that the agreement reached by the attorneys was fair and reasonable to the policyholders, enumerated the various advantages of the settlement to the class members, and determined that the class satisfied the requirements of Rule 23. The court specifically indicated that the class was properly certified under Rule 23(b)(2), that the absent members were adequately represented, and expressed the opinion that delivery of notice via Liberty National agents, together with media coverage of the case, had succeeded in providing notice to approximately 90% of the policyholder class.

### D. *The Collateral Attack in State Court*

The present dispute arises out of the funerals of James J. and Laura F. Taylor and David A. Elrod. Both the Taylors and Mr. Elrod had completed payments on their burial insurance at the time this litigation was settled in September 1977. Because Liberty National agents no longer called on them and they did not see any of the news stories regarding the settlement that were published or broadcast in Birmingham, they received no actual notice of the settlement. Mrs. Taylor purchased a $250 wooden casket policy from Liberty National in 1938, and supplemented it in 1955, transforming her policy into one for a $500 metal casket. Her husband bought similar insurance in 1946 and 1955, as a result of which he was covered under a $600 metal-casket policy. Mr. Taylor died in February 1982, and was followed by his wife in February 1983. Upon the death of each of their parents, the Taylors' children selected a more expensive casket than the one provided for in the burial policies. The charges for Mr. Taylor's funeral totalled over $1,600, from which the funeral home allowed a credit of $600, the value of the deceased's burial policies. The expenses for Mrs. Taylor's funeral eclipsed this figure, amounting to over $3,000. Again, the funeral home offered the children only a $500 discount, the retail value of Mrs. Taylor's policies. A similar scenario unfolded upon the death of David A. Elrod, who was also covered by Liberty National burial insurance. The funeral director selected by his widow, Annie J. Elrod, charged over $1,700 for the funeral, crediting her only with the $600 retail value of his casket policy.

In 1983 and 1984, the Taylors' estate and children and Mr. Elrod's estate and widow brought suit against Liberty National in the Circuit Court for Limestone County, Alabama. These actions challenged the refusal of the company and the funeral homes in question to provide the benefits to which these plaintiffs claimed the decedents had been entitled in the event of an oversale, namely, all the services specified in the policy and a credit for the retail value of the casket promised in the policy.[28] Liberty National asserted the res judicata

---

**28.** The plaintiffs in those actions, who are also the movants in the dispute now before the court, were, in the case of the Taylors' policies, James L. Taylor, as administrator of the estates of Mr. and Mrs. Taylor; James L. Taylor, Frances Louise Taylor Spence, Deborah Taylor, Diane Taylor Stafford, Philip Taylor, and Gretta Taylor, individually as heirs and next-of-kin of the Taylors; and, in the case of Mr. Elrod's policy, Annie J. Elrod, as executrix of his estate and individually.

effect of the final judgment in *Battle* as a defense to each of these suits, claiming that both the company and the funeral homes in question had fully performed the burial policies held by the Taylors and Mr. Elrod by offering a credit for the retail value of the policies. These pleadings provided the Taylors' children and Mrs. Elrod their first notice of the settlement in *Battle*. The Elrod suit and another similar case also brought in 1984, *Carroll v. Liberty National Life Ins. Co.*, were both removed by the company from the Circuit Court of Limestone County to this court. In the two lawsuits brought by the Taylors' children, the circuit court granted summary judgment in favor of Liberty National on the basis of the judgment in *Battle*.

On appeal, the Alabama Supreme Court, in a 4–2 decision, reversed the Circuit Court's ruling in the *Taylor* cases, holding that because the Taylors had not received adequate notice of the *Campbell* lawsuit or its settlement as part of the consolidated action in *Battle*, they had been denied due process and, for this reason, were not bound by the 1977 final judgment.[29] *See Taylor v. Liberty National Life Ins. Co.*, 462 So.2d 907 (Ala.1984). The Supreme Court also suggested that the policyholder class from *Campbell* was included in the *Battle* settlement as a result of a collusive effort by Liberty National and the funeral directors to settle their own differences by extracting unconscionable, unrequited concessions from the policyholders.[30] *Id.*

Within two weeks of the Alabama Supreme Court's decision in *Taylor*, Liberty National petitioned this court, in *Battle*, to enjoin prosecution of the Taylor, Elrod, and Carroll state court cases, on the ground that all four actions were barred by the res judicata effect of the final judgment in *Battle*.[31] In response, the plaintiffs in these three cases defended the Supreme Court's decision in *Taylor*, suggested that this court lacked authority to enjoin state proceedings, and reiterated the due process arguments they had raised in state court. In March 1985, this court entered a preliminary injunction barring the Taylors from further prosecuting their two lawsuits against Liberty National. The court first determined that as a federal court it was not bound by the Alabama Supreme Court's determination of the res judicata effect of the final judgment in *Battle*, and that the Anti–Injunction Act, 28 U.S.C.A. § 2283, did not prevent it from enjoining these state court proceedings because such an injunction was necessary to effectuate the final judgment. Next, the court dismissed the issue of whether the policyholder class in *Battle* was denied due process as irrelevant to the merits of Liberty National's injunction request, although acknowledging that the Taylors and others similarly aggrieved could raise such contentions in this court in a Rule 60(b) attack on the final judgment in *Battle*.[32] Finally,

**29.** The supreme court found that the policyholder class in *Battle* should have been certified under Rule 23(b)(3), instead of Rule 23(b)(2).

**30.** For a critique of *Taylor, see* Recent Decisions, "A Second Bite at the Apple: Collateral Attack and Due Process in *Taylor v. Liberty National Life Insurance Co,*" 36 Ala. Law Rev. 1123 (1985).

**31.** In the 1977 judgment, the court expressly retained jurisdiction to enter any further orders necessary to construe or implement the judgment.

**32.** This court referred several times to the availability of this avenue:
If for whatever reason, there is to be an effort to unravel the settlement, *that effort must be pursued only in the court where the settlement was constructed,* with all the parties to the settlement having the opportunity to participate in the proceedings, and with, of course, appellate review in the only proper reviewing court.

\* \* \* \* \* \*

... [R]espondents initiated discovery calculated to inquire into the propriety of the certification of the policyholder class as a FRCP 23(b)(2) class, into the need for notice to the members of that class, and into the nature, extent and sufficiency of that notice.... conceding, without deciding, that some of the matters embraced in the discovery effort would be relevant were there to be filed in this court (1) a motion under FRCP Rule 60(b) or (2) an independent action predicated upon a claim of inadequacy of representation of the policyholder class or upon a claim of fraud on this court, those matters are not germane to subject petition and have no bear-

apparently considering itself compelled to respond in some fashion to the Alabama Supreme Court's sharp condemnation of the process and substance of the *Battle* settlement, this court opined that the policyholder class in that case had properly been certified under 23(b)(2), that the absent members had received more than adequate notice, and, contrary to the Supreme Court's suggestion that the settlement class was "surreptitiously created," that there was no evidence that a fraud of any sort had been perpetrated on the court.

In May 1987, this court extended the injunction to the Elrod and Carroll cases and rendered it permanent, reiterating much of the discussion from its earlier order, including its comments on the immateriality of the due process dispute to the injunction question and its willingness to entertain a Rule 60(b) motion attacking the final judgment on due process grounds. *Battle v. Liberty National Life Ins. Co.,* 660 F.Supp. 1449, 1458 (N.D.Ala.1987) (Hancock, J.). In July 1989, the Eleventh Circuit affirmed the injunction, but concluded its opinion by observing that the district court

> explicitly invited the state plaintiffs to make their due process challenge in federal court pursuant to a Fed.R.Civ.P. 60(b) motion or through an independent action. Their due process challenge is not foreclosed; it simply must be brought in the forum which has lived with this case for nearly two decades.

*Battle v. Liberty National Life Ins. Co.,* 877 F.2d 877, 883 (11th Cir.1989).

### E. *The Rule 60(b)(4) Motion*

Their path into state court effectively blocked at this juncture, the Taylors' children and Mrs. Elrod took up the mantle of this court's suggestion by filing before it, in February 1990, a motion for relief from the *Battle* judgment pursuant to Rule 60(b)(4). This provision allows a party to be freed from the binding effect of a judgment determined to be "void." The motion specifically requested that the court dissolve the 1987 injunction barring the movants from proceeding with their state court lawsuits against Liberty National. These movants presented three separate attacks on the 1977 final judgment, each of which they sought to certify as a class action on behalf of similarly situated policyholders. Several of the movants, including Mrs. Elrod and two of the Taylor children, claimed to have both a derivative interest in the *Battle* judgment, as heirs of policyholders, and a direct interest, as policyholders themselves.

First, movants asserted that they and other absent members of the policyholder class in *Battle* whose burial insurance was completely paid for at the time of the September 1977 settlement were not bound by the subsequent judgment, on the ground that the court's failure to provide them with notice abridged their due process rights. Second, the Taylors' children and Mrs. Elrod alleged that the oversale provision of the *Battle* judgment was void as to all the absent policyholders because the notice delivered during collection visits by Liberty National agents was "incomplete and misleading" as to the effect of this arrangement on the rights of policyholders, and because the court did not afford them the right to opt out of the lawsuit.[33] Third

---

ing upon the issuance, *vel non,* of the requested injunction.

    \*    \*    \*    \*    \*    \*

The court is of the opinion that the members of the policyholder class are bound by that adjudication unless and until, in a proceeding initiated under Rule 60(b) or by an independent action brought in this court for that express purpose, it is first established that a fraud has been perpetrated upon the court or that the representation of the policyholder class was so inadequate as to constitute a denial of due process to some or all the members of the policyholder class.

*Battle v. Liberty National Life Ins. Co.,* CV 70–H–752–S (N.D.Ala. March 26, 1985) (Hancock, J.) (Findings of Fact and Conclusions of Law), slip op. at 7–11 (emphasis in original).

**33.** Movants specifically point to the settlement notice's use of the phrase, "full retail value of the benefits," in the notice's description of the credit to which policyholders would be entitled in the event of an oversale. According to movants, this language suggested a credit equal not merely to the stated retail value of the policy, represented on the face of the document, but rather to the greater, actual retail value—in oth-

and finally, one of the Taylors' children claimed that she and other holders of vault policies had also been denied due process because the notice distributed by Liberty National agents failed to explain adequately the import of the change in the rights of vault policyholders contemplated by the settlement.[34]  It is important to note that although the movants have at various points impugned the representation provided to the policyholders by the named plaintiffs and especially the class counsel who negotiated the *Battle* settlement, the movants have *not* challenged the 1977 final judgment on the theory that the policyholders were denied due process because they did not receive adequate representation.[35]

Liberty National subsequently filed an "objection" to the Rule 60(b) motion, and moved for a protective order to prevent the Taylors' children and Mrs. Elrod from proceeding with discovery.[36]  Treating Liberty National's "objection" as a motion to dismiss, the court stayed discovery, pending a determination of the legal sufficiency of the Rule 60(b) motion.  Movants and Liberty National have presented the court with extensive briefs, appendices containing all the relevant documents and court records covering the 20–year history of this litigation, and oral argument.[37]

## II.

### A.  *Threshold Issues*

Liberty National and the other non-movants have offered three arguments as to why the court should deny the Rule 60(b) motion without reaching the merits of the due process issues: delay, law of the case, and lack of standing.  However, none of these arguments need detain the court long.

### i.  *Delay*

■ The company asserts that the movants are barred from attacking the final judgment because of inexcusable delay.  Liberty National points out that even if the Taylors' children and Mrs. Elrod had no notice of the *Battle* settlement at the time it was entered, they learned of it in 1984 through the company's pleadings in the state court lawsuits.  Furthermore, this court's preliminary and permanent injunction orders in 1985 and 1987 specifically directed movants' attention toward the availability of the Rule 60(b) avenue.  Nevertheless, they did not file such a motion until 1990, 13 years after the final judgment.  Relying on the requirement that a Rule 60(b) motion be made "within a reasonable time," Liberty National contends that such a lack of "diligence" lends a sufficient basis to deny the motion summarily.

■ The court rejects this assertion by the company for two reasons.  First, the court does not believe that movants displayed a lack of diligence or otherwise sat on their rights.  Indeed, they have repeatedly pressed their due-process claims since Liberty National raised the *Battle* judgment as a res judicata bar to their state court actions.  Although this court and the Eleventh Circuit ultimately determined that they had chosen the wrong forum in which to resolve this dispute, there is no evidence that movants were guilty of bad faith or purposeful delay in exhausting such other avenues before bringing their 60(b) motion.[38]  Second and more importantly, however, it is well established that a

---

er words, the retail cost—of the casket and services guaranteed by the policy.

**34.** Movants specifically point out that the settlement notice did not inform policyholders that the price of an actual vault at that point in time was substantially greater than $100.

**35.** Accordingly, the court does not address the issue of representation in this order.

**36.** Aubrey Carr and Carr–Service Enterprises, the funeral home responsible for the Taylors'

---

funerals, also entered the case at this point, moving to strike the Rule 60(b) motion.

**37.** Counsel for the funeral director class and several funeral homes have also filed briefs and offered oral argument.

**38.** Nor has Liberty National demonstrated that it could reasonably have believed, at any time since the state court actions were filed in 1983, that the controversy had been finally put to rest.

motion under Rule 60(b)(4), challenging a judgment as "void" for lack of due process, is neither governed by the "reasonable" time requirement nor subject to the equitable doctrine of laches, but rather may be brought at any time, at least absent "exceptional circumstances ... difficult to imagine." *Bludworth Bond Shipyard v. M/V Caribbean Wind*, 841 F.2d 646, 649 & n. 6 (5th Cir.1988). *Accord In re Center Wholesale, Inc.*, 759 F.2d 1440, 1448 (9th Cir.1985); *Pacurar v. Hernly*, 611 F.2d 179, 181 (7th Cir.1979); *Austin v. Smith*, 312 F.2d 337, 343 (D.C.Cir.1962); 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2862 at 197–98 (2d ed. 1986). Indeed, not only is a court normally precluded from denying a Rule 60(b)(4) motion as untimely, but, more broadly speaking, it has no discretion to refuse to grant the motion if it determines that the judgment is in fact void because of a failure of due process. *Bludworth*, 841 F.2d at 649; *Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion De Costa Rica*, 614 F.2d 1247, 1256 (9th Cir.1980); *Austin*, 312 F.2d at 343; 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2862, at 197 (2d ed. 1986). Further, whether the movant possessed a meritorious claim or defense on the merits of the underlying action is irrelevant to the Rule 60(b)(4) determination. *Broadcast Music, Inc. v. M.T.S. Enterprises*, 811 F.2d 278, 280 (5th Cir.1987); 7 J. Moore, Moore's Federal Practice, ¶ 60.25[1], at 60–224 (1991). *See also Peralta v. Heights Medical Center*, 485 U.S. 80, 86–87, 108 S.Ct. 896, 900, 99 L.Ed.2d 75 (1988) ("Where a person has been deprived of ... due process, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits") (internal quotation omitted).

#### ii. *Law of the Case*

■ Liberty National next argues that further consideration of movants' due-process claims by this court is barred by the "law of the case" doctrine. *See In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550 n. 3 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990). According to the company, this court determined in the 1977 final judgment that the policyholders had been provided adequate notice, and also considered and rejected the present movants' due-process contentions when it entered a preliminary and permanent injunction against their state court lawsuits in 1985 and 1987. However, the court now concludes that the company's law of the case defense to the Rule 60(b) motion also lacks merit. As for the 1977 final judgment, it is true that the court concluded that sufficient notice had been provided to the policyholder class. However, it is well established that a court adjudicating a dispute ordinarily cannot predetermine the res judicata effect of its own judgment, but rather that this can only be tested in a subsequent proceeding. *Gonzales v. Cassidy*, 474 F.2d 67, 74 (5th Cir.1973); 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure, § 1789 at 245 (2d ed.1986); Federal Rule of Civil Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment. This is especially true where claims of due process are involved. *See Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Although the right of a party to attack collaterally the jurisdiction of a court that entered judgment against her may properly turn on whether she previously directly challenged jurisdiction and lost, *compare Gould v. Mutual Life Ins. Co.*, 790 F.2d 769, 774 (9th Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 580, 93 L.Ed.2d 582 (1986), *with Watts v. Pinckney*, 752 F.2d 406, 410 (9th Cir.1985), an absent class member who mounts a meritorious due-process challenge to a class judgment—in other words, who, like the movants in this case, claims she was functionally excluded from a proceeding because she received inadequate notice and was afforded no right to control the conduct of her personal cause of action—will, by definition, not have had an opportunity in the initial litigation to be heard on the issue of due process. Just as she is not bound by any decision on the merits, she is, for the very same reason, not bound by the initial

court's determination that she received due process.[39]

Liberty National also suggests that the court's 1985 and 1987 injunction orders, arising from proceedings at which movants were directly involved, are law of the case on the issue of whether they together with the original policyholder class received sufficient notice. However, the court's rendition of the relevant statements by it and the Eleventh Circuit in section I(D) of today's order makes clear that not only did neither this court nor the Eleventh Circuit resolve the merits of movants' due-process claims in the injunction proceedings, but, indeed, both courts explicitly indicated that the Taylors' children and Mrs. Elrod were free to raise such claims through a Rule 60(b)(4) motion. *See also In re Real Estate Title & Settlement Services Antitrust Litigation*, 869 F.2d 760, 764 & n. 1 (3rd Cir.), *cert. denied*, 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989). *Compare Fontana v. Elrod*, 826 F.2d 729, 732 (7th Cir.1987).

### iii. *Standing*

■ Rule 60(b) entitles "a party or a party's legal representative" to seek relief from a final judgment. Rideout's, a member of the funeral home class in *Battle* which has joined Liberty National in oppos-

ing the Rule 60(b) motion now before the court, contends that the Taylors' children and Mrs. Elrod lack standing to collaterally attack the final judgment in *Battle* because they were neither parties nor representatives in the original litigation. Contrary to this argument, however, the court believes that the movants do have standing to bring a Rule 60(b) challenge.[40] First, the court has, in another order entered today, granted their motion to intervene formally in the *Battle* case, pursuant to Rule 24; thus, even technically speaking, the Taylors' children and Mrs. Elrod are now parties to the lawsuit. Second, the court previously included them as parties to the case during the 1985 injunction proceedings.[41] Third and most importantly, as persons whose "rights were directly affected by the final judgment," they fit within the category of individuals with standing under Rule 60(b).[42] *See Kem Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1520–21 (11th Cir.1987).

### B. *The Merits*

### i. *Notice of the Action and the Right to Opt–Out*

■ In the ordinary civil case, due process demands, at a minimum, that notice and an opportunity to be heard must be

---

**39.** Indeed, were the court to accept Liberty National's theory, it would essentially mean that absent class members could never collaterally challenge a class-action judgment as violating their rights to due process, for in entering such a judgment or in previously certifying the class, a court will almost always have determined, as a prerequisite to such, that the members have been provided the appropriate notice, representation, and opt-out rights. *See In re Real Estate Title & Settlement Services Antitrust Litigation*, 869 F.2d 760, 769 (3rd Cir.) ("[e]ver since *Hansberry v. Lee* was decided in 1940, collateral attacks have been considered to be a necessary part of the class action scheme"), *cert. denied*, 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989).

**40.** Even if there were some doubt as to movants' standing, Rule 60(b) appears to invest a district court with the authority to vacate a judgment *sua sponte. See Simer v. Rios*, 661 F.2d 655, 663 n. 18 (7th Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982); *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 n. 2 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98

S.Ct. 730, 54 L.Ed.2d 758 (1978); *United States v. Jacobs*, 298 F.2d 469, 472 (4th Cir.1961).

**41.** *See Battle v. Liberty National Life Ins. Co.*, CV 70–H–752–S (N.D.Ala. March 26, 1985) (Hancock, J.) (Findings of Fact and Conclusions of Law), slip op. at 4–5.

**42.** As with Liberty National's "law of the case theory," adoption of Rideout's niggardly standing rule would work a manifest injustice by operating as an across-the-board bar on collateral attacks to class judgments by absent members, even where based on grounds as fundamental as due process. *See* note 39, *supra. In re Four Seasons Securities Laws Litigation*, 525 F.2d 500 (10th Cir.1975), the principal case cited by Rideout's for the proposition that absent class members lack standing to challenge collaterally a judgment under Rule 60(b), is distinguishable from this lawsuit, as the movant there did not raise a due-process challenge but rather sought to use the device of Rule 60(b) to argue that "the settlement was not a good one for the class in that more money should have been exacted from … defendants." *Id.* at 503.

provided to any party whose liberty or property interests may be adversely affected by the proceeding. *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 484–86, 108 S.Ct. 1340, 1344–45, 99 L.Ed.2d 565 (1988); *Peralta v. Heights Medical Center*, 485 U.S. 80, 84–85, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The Supreme Court has repeatedly emphasized that such notice must be provided by a means and in a form "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Pope*, 485 U.S. at 484, 108 S.Ct. at 1344, *quoting Mullane*, 339 U.S. at 314, 70 S.Ct. at 657.[43] This requirement applies equally to defendants, *see Peralta*, 485 U.S. at 81–85, 108 S.Ct. at 897–99, as well as to parties who may be characterized as potential plaintiffs. *See Pope*, 485 U.S. at 484–85, 108 S.Ct. at 1344–45 (creditor with claims against an estate as to probate proceeding); *Adams*, 462 U.S. at 792–95, 103 S.Ct. at 2708–09 (mortgagee of real property as to sale of mortgaged property for nonpayment of taxes); *Mullane*, 339 U.S. at 307–09, 70 S.Ct. at 654–55 (beneficiaries of common trust fund as to judicial settlement of accounts by trustee).[44] Any party who is not provided with such notice of a proceeding and an opportunity to be heard will not be bound by a judgment that results from the proceeding.[45] *See Peralta*, 485 U.S. at 85–86, 108 S.Ct. at 899–900; *Adams*, 462 U.S. at 800, 103 S.Ct. at 2712. Thus a defendant who was denied due process may avoid being subject to damages or other coercive relief ordered in a judgment, and a potential plaintiff whose rights to notice and an opportunity to be heard were similarly abridged will be free to litigate in a later proceeding issues that were decided adversely to him, or that could have been but were not presented, in the earlier suit.

■ One long-recognized exception to these principles is that a judgment in a class action may bind members of the class who did not receive the kind of notice and opportunity to be heard that would be required to render them "parties" to the suit in the traditional sense, provided that their interests were adequately represented. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808, 105 S.Ct. 2965, 2973, 86 L.Ed.2d 628 (1985); *Hansberry v. Lee*, 311 U.S. 32, 43, 61 S.Ct. 115, 118–19, 85 L.Ed. 22 (1940). *See also* 3 H. Newburg, Newburg on Class Actions § 13.41, at 81–82 (1985). Although this exception is firmly established, its parameters are not; both before and after the 1966 amendments to Rule 23 which vitalized the class-action device, the doctrine on the preclusive effect of class-action judgments has been uncertain and changing, principally because of the very difficulty raised by the Rule 60(b)(4) motion now before the court: that of determining the exact extent to which due process permits the representation of an absent member's interests in a particular class suit to substitute for actual notice and an opportunity to be heard. After close scrutiny of the case law in this area, and careful consideration, the court concludes that the guiding standard is one recognized by the drafters of the present version of Rule 23: "In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum." Federal Rule of Civil

---

**43.** For parties whose identity is known or "reasonably ascertainable," this ordinarily means individual notice by mail. *Pope*, 485 U.S. at 489, 108 S.Ct. at 1347. Notice by publication will usually be sufficient for others whose names or addresses cannot be uncovered by reasonably diligent efforts. *Id. Accord Mullane*, 339 U.S. at 315–19, 70 S.Ct. at 658–59.

**44.** Although each of these cases involved parties with monetary claims, the Supreme Court has,

in a different context, recognized that an individual's cause of action for non-monetary relief also constitutes a form of property protected by the due process clause. *See Logan v. Zimmerman Brush*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982).

**45.** Indeed, this general rule has a relatively ancient lineage. *See Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877).

Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment. Applying this test to movants' three challenges to the proceedings that culminated in the settlement in *Battle,* the court further concludes that, even accepting the factual allegations of the Taylors' children and Mrs. Elrod as true, the notice provided by the court prior to the 1977 final judgment was sufficient, under the due process clause, to bar them from relitigating their over-sale and "actual vault" claims.

■ The notice rules contained in Rule 23 were established to guide courts in protecting the due-process rights of absent plaintiffs and affording the maximum possible preclusive effect to class judgments. *See* Federal Rule of Civil Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment; *In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1101 n. 14 (5th Cir.1977). These rules are premised on this notion that the less the interests of individual members coincide with those of other members or the representatives, the greater will be the class notice demanded by due process.[46] Thus in addition to uniformly requiring a certain threshold degree of identity among the claims of the representatives and absent members and insisting that the named parties and class counsel "fairly and adequately protect the interests of the class," Rule 23 applies different notice requirements to different kinds of cases and even to different phases of the same case, depending upon the characteristic degree of unity or cohesiveness among the plaintiffs. First, in class suits of a type in which the interests of the named plaintiffs and the various absent members would be unlikely to diverge—the most prevalent being those maintained under Rule 23(b)(2), where the defendant has acted "on grounds generally applicable to the class" and the main focus of the suit is injunctive or declaratory relief "with respect to the class as a whole"—Rule 23 vests district courts with discretion as to whether to provide notice of the litigation to the class and, if so, by what means. *See* Rule 23(d)(2) (court may require, "for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action"); *Johnson v. General Motors,* 598 F.2d 432, 436–37 (5th Cir.1979); *In re Temple,* 851 F.2d 1269, 1272 n. 5 (11th Cir.1988). *See also Guthrie v. Evans,* 815 F.2d 626, 628 (11th Cir.1987); *Fontana v. Elrod,* 826 F.2d 729, 732 (7th Cir.1987). Second, because the settlement process even in a Rule 23(b)(2) class action is more susceptible than adversarial adjudications to abuse by the representatives to the disadvantage of the class, Rule 23(e) mandates that some form of notice of a class settlement in such a case be afforded to absent members before the settlement is approved by the district court. *See Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147 (11th Cir.1983); *Simer v. Rios,* 661 F.2d 655, 664 (7th Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982). Third and finally, in that category of class suits in which "the interests of the individuals in pursuing their own litigations" may be particularly "strong"—where the plaintiff class is certified under the less stringent standard of Rule 23(b)(3) on the basis that questions of law or fact "common" to the members "predominate" over questions affecting only individual members—Rule 23(c)(2) mandates that, as with parties to non-class suits, absent plaintiffs without exception be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[47] Federal

---

**46.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the court adopted as binding precedent all of the decisions of the Former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**47.** Absent members who are not identified and cannot be located through diligent efforts, or

Rule of Civil Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176–178 & n. 14, 94 S.Ct. 2140, 2152 & n. 14, 40 L.Ed.2d 732 (1974). Furthermore, Rule 23(c)(2) also demands that class members in such a case be afforded and informed that they have a right to "opt out"—to exclude themselves from the class and the lawsuit. *Id.;* Federal Rule of Civil Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment.

That the true measure of the notice required by due process is the cohesiveness or unity of the class is demonstrated even more clearly by the analysis employed by courts confronted with a challenge by a class member to the preclusive effect of a class judgment in a case certified as a Rule 23(b)(2) action. The law in this circuit is that such claims cannot be resolved simply by determining whether the action as a whole was properly maintained under Rule 23(b)(2)—and therefore notice was discretionary with the court—or should instead have been certified as Rule 23(b)(3) actions

persons whose interests in the suit are merely conjectural, need not be provided with individual notice—for example, mail notice—in order to be bound. *In re Agent Orange Product Liability Litigation,* 818 F.2d 145, 168–69 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Furthermore, plaintiffs who are in fact provided with appropriate notice need not actually receive it in order to be bound. *See* 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1789 at 253, 255–56 (2d ed. 1986).

**48.** Both movants and Liberty National have dwelled extensively in their briefs on the issue of whether the court erred in certifying the policyholder class under (b)(2) rather than (b)(3). Each side has dissected the various claims presented in *Battle,* seeking to show whether the policyholder action was "exclusively" or "predominately" one for declaratory and injunctive relief, or for monetary relief. *See* Federal Rule of Civil Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment. *See also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 n. 3, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985). The "predominance" test is rather subjective, difficult to apply, and ultimately a matter which it is "counterproductive for the court to expend time" trying to resolve. *See* 1 H. Newburg, Newburg on

with notice provided as required by Rule 23(c)(2).[48] Rather, the due-process inquiry focuses more specifically on the substantive claim or request for relief that the absent member now seeks to litigate or relitigate; if it involves individual, usually monetary, relief, then it will not be barred unless he was provided with notice and a chance to opt-out of the prior proceedings. *See Holmes v. Continental Can Co.,* 706 F.2d 1144, 1155 (11th Cir.1983) (notice required to preclude absent member in employment discrimination class action from subsequently asserting individual back-pay claim); *Johnson v. General Motors Corp.,* 598 F.2d 432, 437 (5th Cir.1979) (same). However, such notice and opt-out rights are not required with respect to initial proceedings on pattern-and-practice liability or on injunctive or declaratory relief; thus a plaintiff will be barred from relitigating these issues even though he was afforded no notice or chance to exclude himself from the class. *See Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1554 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).

Class Actions § 4.14 at 299 (1988). More importantly, it is only a rough or "wholesale" version of the same cohesiveness inquiry which, as described below, is customarily applied in this circuit more particularly on a claim-by-claim basis rather than to a lawsuit in its entirety.

It is important to note, however, that when a class is actually certified under Rule 23(b)(3), the strict notice requirements of Rule 23(c)(2) must be followed, without regard to whether they exceed the demands of due process; in other words, even where a Rule 23(b)(3) class possesses a high degree of cohesiveness and is more than adequately represented by the named parties and their counsel, a failure to provide notice as set forth in Rule 23(c)(2) constitutes reversible error. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176–77 & n. 14, 94 S.Ct. 2140, 2152 & n. 14, 40 L.Ed.2d 732 (1974) (rejecting arguments that "adequate representation, rather than notice ... satisfies Rule 23" in action maintained under subdivision (b)(3); "quite apart from what due process may require ... Rule 23(c)(2) requires that individual notice be sent to all class members who can be identified with reasonable effort"). *See also In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088 (5th Cir.1977); 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1789 at 251 (2d ed. 1986).

The special treatment accorded back-pay claims in *Holmes* and *Johnson* turned on the heterogeneity and lack of cohesiveness among the class members with respect to such claims. Requests for equitable relief normally involve *"class* claims, claims resting on the same grounds and applying more or less equally to all members of the class." *Holmes,* 706 F.2d at 1155 (emphasis in original). Thus in such proceedings, the "substantial cohesion of [the class members'] interests makes it likely that representative members can adequately represent the interests of absent members and that the need for and interest in individual representation will be minimal." [49] *Id.* at 1155 n. 8, *quoting* Note, Notice in Rule 23(b)(2) Class Actions for Monetary Relief: *Johnson v. General Motors Corp.,* 128 U.Pa.L.Rev. 1236, 1252–53 (1980). *Accord Johnson,* 598 F.2d at 437 (notice discretionary in equitable relief phase of (b)(2) case because "plaintiff group" likely to be "cohesive" and thus "the due process interests of absent members will usually be safeguarded by adequate representation alone"). In contrast, requests for back pay, not necessarily because they involve monetary relief but because they are "atypical" and "directly related to the disparate merits of individual claims [rather than] generally applicable to the claims of the class as a whole," are more likely to give rise to "heterogeneous" classes "pregnant with potential tensions and interest-antagonisms between class members."

*Holmes,* 706 F.2d at 1154–57. Indeed, the court in *Holmes* specifically relied on the divergent character of the back-pay claims in that case, noting that the lawsuit "involves a finite and relatively small lump sum fund that must be divided among a relatively large class," and thus concluding that "[a]llocation of this fund is a zero sum situation: a gain to one party entails a corresponding loss for the other parties." *Id.* at 1160. The court took care to distinguish such a situation from a "back pay class in which all members are affected equally by a settlement," which, the court observed, "would, of course, be sufficiently homogeneous to obviate any need for an opt out protection." [50] *Id.* at 1158. *See* Federal Rule of Civil Procedure 23, Supplementary Note of Advisory Committee on 1966 Amendment (observing that "[s]ubdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific ... relief could be brought by a numerous class of purchasers ... against a seller" who sold goods to them at an illegal "pricing differential"). *See also Scott v. City of Anniston, Ala.,* 682 F.2d 1353, 1358 (11th Cir.1982). For these reasons, in *Holmes* and *Johnson,* both of which, like *Battle,* involved class settlements, the court concluded that "due process required individual notice" and the right to opt-out "before the personal pecuniary claims of absent class members could be barred, even though the case had been certified under (b)(2)." *Holmes,* 706 F.2d at 1157. *Accord Johnson,* 598 F.2d at 438. [51]

**49.** "[M]embers who were not notified or given an opportunity to exclude themselves from the class were in no way deprived of due process since their claims rested on precisely the same grounds as all the other members and all the issues they would or could have raised were, in fact, adjudicated in the context of the class. Too, their relief, if any—since it was of an injunctive nature—was also intended to be identical: a halt to the alleged wrongful actions or policies." *Holmes,* 706 F.2d at 1157.

**50.** Conversely, it is conceivable that certain equitable remedies, such as restitution, are sufficiently individual rather than class in nature as to present the same likelihood of divergent interests and thus the same need for heightened notice, as requests for individual, legal relief. *See* A. Miller & D. Crump, Jurisdiction and Choice of Law in Multistate Class Actions After

*Phillips Petroleum Co. v. Shutts,* 96 Yale L.J. 1, 27 (1986); 1 H. Newburg, Newburg on Class Actions § 4.15 at 301 (1985). *See also* Recent Decisions, "A Second Bite at the Apple: Collateral Attack and Due Process in *Taylor v. Liberty National Life Insurance Co.,"* 36 Ala.L.R. 1123, 1139 (1985) ("[m]oney damages or property rights alone insufficiently warrant mandatory notification; only differing *claims* among the members of the class should create this requirement.... predominantly individual claims merit more stringent notice requirements, but predominantly group claims do not").

**51.** The Supreme Court's decision in *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), arguably raises some question as to whether Rule 23(b)(3)-type notice requirements apply as a matter of due process to class action claims for money judg-

Thus, with regard to the Rule 60(b)(4) motion now before the court, the court must examine how cohesive the policyholder class was in *Battle* in order to determine the kind and degree of notice to which due process entitled the absent members. As *Holmes* and *Johnson* instruct through their focus on the specific back-pay claims raised by absent members in those cases, the court need not ultimately address here whether the final judgment in *Battle* is void in the abstract or its entirety, nor must it determine the complete extent of that judgment's preclusive effect on the Taylors' children and Mrs. Elrod. Rather, the only matter squarely and properly presented by the Rule 60(b)(4) motion now before the court is whether the 1977 final judgment bars movants from relitigating state law claims concerning, one, their

rights as casket policyholders—or heirs of such policyholders—in the event of an oversale, and, two, in the case of one of the Taylor children, her right as a vault policyholder to receive an actual vault. Movants have offered no indication that they wish to litigate the antitrust claims or any other claims that were advanced or could have been advanced by policyholders in *Battle*. Accordingly, the court will not render an advisory opinion about whether the final judgment's disposition of these matters violated movants' due-process rights.

██  After close examination of the factual and legal nature of the oversale and "actual vault" issues resolved by the *Battle* settlement—and raised again in movants' state-court suits—the court is convinced that the interests of the absent poli-

---

ments, regardless of class cohesiveness. *Shutts* involved a Kansas state court class action brought on behalf of approximately 28,000 owners of royalty rights to natural gas leases used by the defendant petroleum company. Plaintiffs sued to recover interest on royalty payments which had been delayed by the defendant. The average claim of each owner was $100. The central issue in the case appears to have been the appropriate rate to be used to calculate interest on suspended payments. The Supreme Court, ignoring the issue of the class's apparent cohesiveness, found that the royalty holders challenging a judgment in the case had been afforded due process because the trial court had provided absent members with individual notice and opt-out rights. The court defined the kind and degree of notice mandated by due process by categorizing the case as one "wholly or predominately for money damages," rather than for "equitable relief." *Id.* at 811 & n. 3, 105 S.Ct. at 2974 & n. 3.

A close reading of *Shutts* and of subsequent cases and commentaries on it, however, convinces this court that it is essentially distinguishable from *Battle*. First, *Shutts* involved a challenge to the Kansas court's judgment brought by absent plaintiffs who were citizens of foreign states. Their argument and the court's analysis focused principally on the extent to which such class members may be analogized to out-of-state defendants who are afforded heightened due-process protection by the "minimum contacts" requirement. *See id.* at 806–14, 105 S.Ct. at 2971–76. Thus it is reasonable to view the particular due-process analysis in *Shutts* as limited to the situation of the out-of-state class member. *See* A. Miller & D. Crump, Jurisdiction and Choice of Law in Multistate Class Actions After *Phillips Petroleum Co. v. Shutts,* 96 Yale L.J. 1, 27 (1986) (characterizing *Shutts* as "a case con-

cerned with the evils of distant forum abuse," with the right to opt-out essential to preserve out-of-state class member's prerogative not to be part of lawsuit if member or her action lacks sufficient contacts with the forum). *See also In re Real Estate Title & Settlement Service Antitrust Litigation,* 869 F.2d 760, 765–69 (3rd Cir. 1989) (conceiving notice requirements elaborated in *Shutts* as translation of minimum-contacts standard for personal jurisdiction over out-of-state defendants into context of class action involving out-of-state absent plaintiffs).

Second, this court also believes that the reference in *Shutts* to the right afforded absent members in that case to opt-out of the class was intended to indicate not that such a measure was *required* by due process, but rather that it together with the other aspects of the notice provided by the Kansas court was constitutionally *sufficient.* Indeed, such a limited holding was all that was necessary to resolve the central argument presented to the court by the absent plaintiffs' challenge, namely, that out-of-state class members could not be bound by a judgment unless they had opted-*in* to the lawsuit. 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1789 at 255 (2d ed. 1986) ("The problem is that *Shutts* itself was a picture-perfect case, meeting all of [the discussed] requisites. The court did not have to confront the question whether all [these requisites] necessarily had to be present in order to allow a binding judgment"). *See also In re Asbestos School Litigation,* 620 F.Supp. 873, 876 (E.D.Pa.1985) (refusing to afford opt-out rights to members of punitive damage class; despite reference in *Shutts* to "money judgments" and fact punitive damages involve legal relief, such damages are "more similar to equitable relief"), *rev'd on other grounds,* 789 F.2d 996, 1005 (3rd Cir.), *vacated,* 791 F.2d 920 (1986).

cyholders in that case, both with respect to each other and the named plaintiffs, were extremely cohesive. As detailed in section I(A) of this order, all the Liberty National casket policies held by class members were virtually identical in their terms and conditions, the only distinctions being between the wooden casket policies and the more expensive metal casket ones, and between paid-up policyholders and those who were continuing to make payments on their burial insurance. Furthermore, the overwhelming majority of funerals covered by such insurance involved oversales.[52] It is true that the practical effect of the oversale provision of the settlement on policyholders and their heirs was to be monetary in nature, in the sense that it would determine the actual dollar value of the policy in the event of an oversale, and thus the money owed to the funeral director for a particular combination of funeral merchandise and services. However, at the time of the settlement, the agreement to allow an oversale credit for the face value of a casket policy—or for that matter, any uniform, across-the-board solution to the oversale dispute—did not discernibly affect one policyholder differently from another. None of the plaintiffs' claims was characterized by any special or unique factual or legal twists. Each member of the class shared an equal interest in obtaining maximum oversale rights: ideally, the more valuable package of rights claimed by movants, a casket credit coupled with free provision of the services guaranteed in the policy, but in any event certainly more than the zero credit that the funeral directors and Liberty National were prepared to argue was proper under the language of the policies. Although the settlement was, like any, a compromise between these ex-

tremes, it was in no sense—nor could it have been, given the common nature of the oversale issue—a trade-off of the interests or preferences of some plaintiffs against those of others. Thus understood, the oversale issue in *Battle* resembled the claims for injunctive or declaratory relief in *Holmes* and *Johnson* rather than the *individual* back-pay claims in those cases. Each policyholder's oversale claim was identical in *Battle*, in contrast to the differing amounts of money involved in the various employees' back-pay claims in *Holmes* and *Johnson*. Also importantly, back-pay claims, if settled, normally involve allocation of a fund which results in a "a zero sum situation" where "a gain to one party entails a corresponding loss for other parties." *Holmes*, 706 F.2d at 1160. On the other hand, the oversale issue in *Battle*, from the start, lent itself to a uniform settlement according to which the various policyholder's oversale rights could be governed by the same rule, rather than fixed at different monetary levels; in other words, "relief with respect to the class as a whole" was "appropriate" in the case of the oversale issue. Federal Rule of Civil Procedure 23(b)(2).

This same kind and degree of cohesiveness characterized the vault policyholders interests with respect to the "actual vault" issue resolved in *Battle*.[53] Each insured's claim was identical, and any relief granted in the way of reforming the policyholders' rights would inevitably have involved class relief, affecting the absent members generally rather than as individuals.

For these reasons, the court concludes that the burial policyholders were not entitled under the due process clause to Rule 23(b)(3)-type notice—individual notice and the right to opt-out. The court need

---

**52.** It is worth noting that because the settlement affected the rights of policyholders still living—in other words, those whose heirs had not yet exercised the policyholder's rights—there was no rigid demarcation between those whose funerals would or would not involve oversales. Rather, it is reasonable to assume that, at the time of the settlement, all policyholders would have expected that their heirs might purchase a more expensive casket or services than those provided in the policy, and, therefore, that their

policies could be affected by the oversale provisions of the settlement.

**53.** Movants do not suggest any conflict of interest between the casket and vault policyholders. Most of those who held vault insurance had also purchased a supplementary casket policy so as to entitle them to funeral services. *See* section I(A). Moreover, according to movants, both groups of insured suffered unfairly as a result of the settlement in *Battle*.

not determine, however, that no notice at all would have been constitutionally adequate in these circumstances. Suffice it to say that the notice provided by the court in 1977—individual notice to policyholders still making payments and certain "media" notice in the Birmingham area [54]—was enough to subsequently bind this 23(b)(2)-type plaintiff class as to any oversale or "actual vault" claims, consistent with due process. *See Johnson,* 598 F.2d at 436–37; *Bogard v. Cook,* 586 F.2d 399, 408 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979); *Fontana,* 826 F.2d at 732; 3B J. Moore, Moore's Federal Practice ¶ 23.55 at 23–417 (2d ed. 1990). Because such notice was appropriately designed not to afford absent members the chance to exclude themselves from the class, but rather to inform them of the pendency of the action and permit them to challenge the representation by the named plaintiffs and class counsel or to otherwise intervene, the fact that paid-up policyholders did not receive notice did not frustrate this purpose. *See* Federal Rule of Civil Procedure 23(d)(2). Because such policyholders shared the same interests as those who did receive notice, the latter could adequately speak for them vis-a-vis the named plaintiffs and class counsel. *See In re Agent Orange Product Liability Litigation,* 818 F.2d 145, 168–69 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988).

Had the *Battle* litigation proceeded to trial and the challenged final judgment been the result of such an adversarial proceeding, the court could at this point conclude its analysis of movants' due-process contentions. However, the fact that the 1977 judgment emerged from a settlement among the parties triggered another notice prerequisite under the due process clause, different from the notice constitutionally required to inform an absent class, however cohesive, of the pendency of an action: the obligation of the court to insure that class members receive notice of and the right to object to the settlement. The Taylors' children and Mrs. Elrod claim that the notice provided prior to the court's approval of the 1977 settlement was constitutionally inadequate, both in its scope, because of the failure to direct notice to paid-up policyholders, and in its content, because it was misleading and incomplete.[55] The court now turns its attention to these issues.

### ii. *Notice of the Settlement and the Right to Object*

As the court explained previously, settlement represents one of the three categories of class action "situations" in which Rule 23 provides for notice to the class. The nature and degree of notice required by Rule 23(e) and due process—which the court assumes are identical for the purposes of this case—is calibrated to the degree of disunity and divergent interests that is presumed to attend class settlements, and the accompanying risk that the named plaintiffs and class counsel may compromise the interests of the class in arriving at a settlement that serves their own purposes. *See Holmes v. Continental Can Co.,* 706 F.2d 1144, 1147 (11th Cir. 1983); *Simer v. Rios,* 661 F.2d 655, 664 (7th Cir.1981). *See also* M. Weber, Preclusion and Procedural Due Process in Rule

---

**54.** *See* 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1786 at 208 (2d ed. 1986) (noting that several courts have suggested that Rule 23 "does not require publication to be accomplished through formal newspaper advertisements ... [and that in those cases] the attention given the action by the news media provided adequate notice" for purposes of Rule 23).

**55.** Movants do not challenge the process by which the court entertained objections from those class members who had received notice of the settlement, and considered those objections.

Furthermore, although movants are critical of the court's certification of the policyholders as a temporary settlement class—in other words, its decision to approve tentatively the proposed settlement at the same time it certified the class, in contrast to the customary course of events in which certification precedes settlement—the court does not treat this as an independent basis for their attack on the settlement. Temporary settlement classes are not prohibited either by Rule 23 or the constitution, although commentators and courts are divided as to their appropriateness. *See* 2 H. Newburg, Newburg on Class Actions § 11.27 at 425–432 (2d ed. 1985).

23(b)(2) Class Actions, 21 U.Mich.J.L. Reform 347, 388–89 (1988). Because this divergence of interests and risk of unfairness lies somewhere between that associated generally with the litigation of suits involving, on the one hand, cohesive classes, and on the other, classes characterized by individual, distinct interests, the notice required in the event of settlement similarly is more certain than the discretionary notice allowed in Rule 23(b)(2)-type situations, but less extensive than that afforded in Rule 23(b)(3)-type circumstances—the best practicable individual notice coupled with opt-out rights.

▇▇▇ Accordingly, Rule 23(e) states that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." It is well established, as the closing words of this section suggest, that a district court has great discretion in determining the kind of notice to employ in alerting class members to a proposed settlement and settlement hearing, subject to "the broad reasonableness standards imposed by due process." *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir.1979). *See also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir.1985); *Mendoza v. Tucson School Dist. No. 1*, 623 F.2d 1338, 1350–51 (9th Cir.1980). More specifically, a court is not required to provide individual notice of a proposed settlement to the class members. *Franks v. Kroger Co.*, 649 F.2d 1216, 1222–23 (6th Cir.1981), *vacated on reh'g on other grounds*, 670 F.2d 671 (1982).

▇▇ Prior to the 1977 settlement hearing in *Battle*, the court provided for Liberty National agents to deliver individual written notice to, what movants do not deny was, at the very least, a substantial majority of the policyholder class. Moreover, newspaper and television coverage of the settlement served to alert other absent plaintiffs to its provisions and the upcoming fairness hearing. The court received numerous questions and complaints, both in writing and orally from policyholders attending the hearing. Some of these objections touched on the oversale provisions of the settlement, and many more were directed to the alteration in the rights of vault policyholders. These facts persuade the court that the notice of the settlement provided by the court in 1977 amply accomplished the purposes for which due process requires such notice, namely, to "assure that before settlements receive judicial approval the court be well-informed of the views of those who feel that they are being called upon to make the sacrifices. Only by being so informed can the court be certain that the settlement does not compromise the legal rights of class members without their consent. Such a compromise is a violation of due process." *Mandujano v. Basic Vegetable Products*, 541 F.2d 832, 835 (9th Cir.1976). *See also Simer*, 661 F.2d at 664. Movants quote language from *Mandujano* suggesting that it violates Rule 23(e) and due process "systematically [to] leave an identifiable group without notice." However, a close reading of *Mandujano* makes clear that the kind and degree of settlement notice demanded by the court in that case reflected the degree of cohesiveness within the class, a principle that has guided this court's review of the settlement notice in *Battle*. In referring to "an identifiable group," the Ninth Circuit explained that the failure of a substantial majority of the absent members to receive notice of the settlement was problematic because the interests of seasonal migratory workers, one of the groups who received virtually no notice, conflicted with those of other members of the plaintiff class. *Mandujano*, 541 F.2d at 837. In contrast, the interests of those class members in *Battle* who did receive notice of the settlement were essentially identical to the interests of the paid-up policyholders who were not alerted to the settlement—at least as to the oversale and "actual vault" provisions— and the former raised just the sort of questions and objections that the latter would have raised and, in the case of the Taylors' children and Mrs. Elrod, have in fact attempted to present in their state court lawsuits. *See In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 168–69 (2d Cir.1987) ("the interests of all of the plaintiffs are identical ... with regard to

the facts and the law relevant to the military contractor defense. The class members with actual notice therefore would have represented the interests of the class members unaware of the action").

Beyond alleging that dissemination of the *Battle* settlement notice was not sufficiently widespread, movants also challenge the content of the notice delivered to the policyholders, on the basis that it was misleading and incomplete as to both the oversale and "actual vault" provisions of the settlement, and for this reason violated due process. The court disagrees. A class settlement notice need only properly identify the plaintiff class and generally describe the terms of the settlement so as to alert members "with adverse viewpoints to investigate and to come forward and be heard." *Mendoza,* 623 F.2d at 1352. *See In re South Florida Waste Disposal Antitrust Litigation,* 896 F.2d 493, 495 (11th Cir.1990) (per curiam); *Burns v. Elrod,* 757 F.2d 151, 155 (7th Cir.1985). The notice is "not required to provide a complete source of settlement information." *In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1125 (9th Cir.1977). *See also Greenspun v. Bogan,* 492 F.2d 375, 382 (1st Cir.1974). It is true, as movants argue, that the notice's explanation of the oversale provision of the settlement is far from a model of clarity and that the notice would have been more informative had it discussed the significance of this and the "actual vault" portions of the settlement. However, it is impossible to say that such explanations were so sketchy or misleading as to violate the due-process rights of absent class members.[56]

### III.

Had this judge made the initial decision to provide notice to the policyholder class, he might well have exercised his discretion to order more extensive notice. Movants, like the Alabama Supreme Court in *Taylor,* may also be correct in pointing to the unfairness of the settlement's oversale and "actual vault" provisions to policyholders. However, movants' rights at this point with respect to the settlement, and the scope of this court's review, are limited to relief only from those errors which rose to the level of a due-process violation. Because the court finds no such violation, even accepting the allegations by the Taylors' children and Mrs. Elrod as true, the court concludes that their Rule 60(b)(4) motion is due to be denied. In closing, the court observes that however substantively disadvantageous the settlement may have been to these movants, there are substantial equities which at this late date fall on the other side of the equation. This court correctly noted in its 1987 injunction order that a complex judgment, constructed after extensive litigation, materially affecting the rights of millions of individuals, and on which all the parties have substantially relied for fourteen years, "should not lightly be torn down." *Battle v. Liberty Nat'l Life Ins. Co.,* 660 F.Supp. 1449, 1452 (N.D.Ala.1987) (Hancock, J.). Whatever the shortcomings of the notice provided to policyholders by the court in 1977, they are insufficient to justify relief under the constitutional wrecking ball of Rule 60(b)(4).

---

**56.** The *Battle* litigation and settlement was sufficiently complex that it would have been impossible for counsel and the court to produce a perfectly informative class notice. Indeed, class notices written by lawyers have in many cases proven incomprehensible to average citizens. For example, when the Attorney General of North Carolina sent out extensive class notices in a case brought on behalf of users of tetracycline, he received many confused responses including the following:

Dear Mr. Clerk: I have your notice that I owe you $300 for selling drugs. I have never sold any drugs, especially those you have listed; but I have sold a little whiskey once in a while.

Dear Sir: I received this paper from you. I guess I really don't understand it, but if I have

been given one of those drugs, nobody told me why. If it means what I think it does, I have not been with a man in nine years.

Dear Sir: I received your pamphlet on drugs, which I think will be of great value to me in the future. I am unable to attend your class, however.

Dear Mr. Attorney General: I am sorry to say this, but you have the wrong John Doe, because in 1954, I wasn't but three years old and didn't even have a name. Mother named me when I got my driver's license. Up to then, they just called me Baby Doe.

A. Miller & D. Crump, Jurisdiction and Choice of Law in Multistate Class Actions After *Phillips Petroleum Co. v. Shutts,* 96 Yale L.J. 1, 22 & n. 162 (1986).

Accordingly, it is the ORDER, JUDG-MENT, and DECREE of the court that the objection filed by defendant Liberty National Life Insurance Company on March 28, 1990, is sustained and the motion to strike filed by plaintiffs Aubrey Carr and Carr Services Enterprises, Inc., on April 3, 1990, is granted to the extent that the motion pursuant to Rule 60(b), filed by plaintiff-intervenors James L. Taylor, Francis Taylor Spence, Deborah Taylor, Diane Taylor Stafford, Philip Taylor, Gretta Taylor, and Annie J. Elrod on February 26, 1990, be and it is hereby denied.

It is further ORDERED that costs associated with said Rule 60(b) motion be and they are hereby taxed against the plaintiff-intervenors, for which execution may issue.